WILLIAM R. BARR et al., Appellants, v. THE NEW YORK, LAKE ERIE AND WESTERN RAILROAD COMPANY et al., Respondents.

Where the possession of property has been transferred under a contract legal in itself, but induced by fraud, while the fraud furnishes ground for rescinding the contract and avoiding the obligations imposed thereby, it may not be availed of as a means of continuing possession of the property without meeting those obligations.

Express ratification need not be shown, but where the party, after knowledge of the fraud and an opportunity to rescind, still retains the possession and use of the property, without any offer to return the same, the fraud is waived and the contract becomes valid by acquiescence.

While the rule which forbids persons who fill fiduciary positions from using them for their own benefit, is strict in its requirements and extends to all transactions where the individual's personal interest may be brought into conflict with his acts in a fiduciary capacity, and works independently of the question whether there was fraud or good intention, it does not operate to avoid *ab initio* all transactions of a trustee where he is interested, but it is generally limited in its operation to rendering them voidable at the election of the party whose interests are concerned; and so, if nothing is done in avoidance the transaction remains undisturbed.

The S. B. & E. J. R. R. Co., defendant, was incorporated to construct a railroad to connect the road of the E. R. Co. with other railroads; some of the incorporators were directors of the latter company. In June, 1870, a contract was made by the new company ostensibly with one S., who agreed to construct the road, the company to issue in payment therefor $1,000,000 of its bonds and $500,000 of its capital, which was to constitute all of its stock and bond debt. S. in reality acted for a syndicate composed wholly of members of the board of directors of said company, part of whom were also directors of the E. R. Co.; S., a few days thereafter, assigned the contract to the syndicate. In July, 1870, the new company leased all of its property and franchises to the E. R. Co., the lessee agreeing to pay as rent a certain proportion of the gross earnings, guaranteeing that this should never be less than $105,000. The executive committee of the E. R. Co. passed a resolution, which, after reciting the lease and the guaranty of a rental equal to seven per cent interest on the bonds, and seven per cent dividends on the stock of the lessor, authorized the execution of a guaranty of the payment of semi-annual dividends of three and one-half per cent on the stock. The stock and bonds were issued to members of the syndicate; they expended about $850,000 in the construction of the road. In December, 1870, the road, being about completed, was taken possession of by the lessee. In February, 1871, the directors of the lessor formally ratified the lease. In 1875, the lessee became insolvent; a receiver was appointed who, by authority of the court, continued to operate the leased road. The lessee and its receiver bought in all of the stock of the lessor, except certain shares owned by plaintiffs, and thereby obtained complete control, and thereafter elected directors in the interest of the lessee. The property and assets of the lessee, including the lease, were sold under a mortgage foreclosure judgment. In 1878, the N. Y., L. E. & W. R. R. Co. became the owner, it covenanting to pay all of the receiver's liabilities, and it has since continued to operate the leased road, which is of great value to it as connecting its own and other roads, but it has paid nothing except interest on the bonds, refusing to pay that portion of the rental represented by the guaranty of dividends on the stock. In an action to compel the N. Y., L. E. & W. R. R. Co., as successor in interest of the lessee, to pay the balance of the rent reserved, the trial court found that the syndicate, fraudulently and for their own benefit and gain, caused

the building contract, the lease and the guaranties to be made, and directed a dismissal of the complaint. *Held*, error; that the fraudulent nature of the transaction did not render the lease absolutely void, but simply voidable; and that the lessee and its successor in interest could not retain the possession and enjoy the use of the leased property, after knowledge of the fraud and with opportunity to act in repudiation, without becoming liable to pay the rent reserved; that the vice in the original transaction did not necessarily so affect the lease as to prevent ratification, or its survival after acts on the part of the lessee and its successors in interest, with knowledge of the fraud, amounting in effect to acquiescence and waiver.

Also *held*, that plaintiffs, as stockholders, could maintain the action, as their corporation was wholly under the control of its lessee.

Also *held*, that defendant, the N. Y., L. E. & W. R. R. Co., was not in a position to question the legality or validity of the issue of the shares of stock held by plaintiffs, as the members of the syndicate that built the road of the S. B. & E. J. R. R. Co. were practically the company, they holding all of its stock, and so, the manner in which they chose to build the road and to divide up their interests, concerned only themselves, and however illegal the transaction, no one, so far as appeared, could complain.

*It seems* that no principle of law forbade the said company from agreeing to pay for the construction of its road in the way or in the amount it did.

*Munson* v. *S. G. & C. R. R. Co.* (103 N. Y. 58); *Wardell* v. *R. R. Co.* (103 U. S. 651), distinguished.

*Barr* v. *N. Y., L. E. & W. R. R. Co.* (52 Hun, 555), reversed.

(Argued December 12, 1890; decided January 13, 1891.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made January 16, 1889, which affirmed a judgment in favor of defendant entered upon a decision of the court on trial at Special Term.

The plaintiffs, as stockholders of the Suspension Bridge and Erie Junction Railroad Company, have brought this action against that company, the New York, Lake Erie and Western Railroad Company, and Hugh J. Jewett, as receiver of the Erie Railway Company, as defendants, to compel the payment of certain rental moneys, which were payable according to the terms and provisions of a lease, under which the New York, Lake Erie and Western Railroad Company is now operating the road of the company first named.

The action was instituted by the plaintiffs, because the lessee company owned all the rest of the stock of the lessor company, and through its possession had obtained the control of its management and board of direction.

Upon the trial the complaint was amended by striking out the Erie Railway Company as a party defendant, and the recovery sought is actually against the present corporation, which is in possession of the leased road, as successors to the Erie Railway Company, and to Jewett as its receiver, and the demand covers the period commencing with and continuing since his possession and operation as such receiver.

The facts proved concerning the origin and history of the lease in question, and which exhibit the acts of all the parties are not in dispute. In October, 1868, the plaintiffs' company was incorporated to construct and operate a railroad in order to connect that of the Erie Company, at the city of Buffalo, with the Canadian system of railroads by way of the Falls of Niagara. This was unquestionably a desired and much-needed connection. The then Erie management promoted the formation of this company and some of its incorporators were directors of the Erie Company. Various schemes of construction were prepared and abandoned, but in June, 1870, a contract was made by which Mortimer Smith agreed to build the road and the Suspension Bridge Company agreed to issue in payment therefor $1,000,000 of its seven per cent bonds and $500,000 of capital stock, these issues to constitute the whole of its stock and bonded debt. Of the directors who authorized this contract, several were also Erie directors. Smith was an assistant secretary of the Erie Company, and was a mere figure-head, or conduit of interest, for on the same day, a syndicate was formed composed wholly of members of the board of directors of the Suspension Bridge Company, whose agreement was to subscribe and take the stock and bonds from Smith as they were received, and to whom a few days later in June, upon their request, Smith assigned his contract. In July, 1870, the lease in question of all the property and franchises of the plaintiffs' company was

executed. Its execution had been authorized, in the previous month, at a special meeting of the Erie board of directors, their resolution reciting the project of the road, the issuance of bonds for completing it, and directing a lease, in which the rent reserved should be fixed at a sum equal to thirty per cent of the gross earnings of the leased road and guaranteeing that such sum should never be less than $105,000 per annum. In November following, the executive committee of the Erie Company, by resolution which recited the making of the lease and guarantee by the lessee of a rental of $105,000, equal to seven per cent interest on the issue of bonds and seven per cent dividend upon the $500,000 of capital stock, authorized the execution of a guarantee of the payment of a semi-annual dividend of three and a half per cent upon the stock. In December, 1870, the road being then almost but not in all respects completed, it was taken possession of by the Erie Company. In February, 1871, the directors of the lessor company formally ratified the lease. There had been expended by the syndicate in construction work about $850,000, of which plaintiff Barr and plaintiff Bush's assignor had contributed each their due proportion. The stock and bonds had been issued to the members of the syndicate and of the former, plaintiff Barr received 335 shares and plaintiff Bush's assignor received 330 shares, of which eighty were assigned to Bush. The Erie Company paid the full amount of the rental moneys, in interest on bonds and dividends on the stock, down to January 1, 1872, and since then, only an amount of moneys equal to the interest on the issue of bonds has been paid. In March, 1872, a change occurred in the Erie management, which was overthrown, and the road then came under the direction of a board presided over by John A. Dix.

In May, 1875, the Erie company became insolvent and Hugh J. Jewett was appointed by the court as its receiver. Under the court's authority to that effect, he continued to operate the leased road as a part of the Erie's system of connections. Between the years 1872 and 1876 the Erie Company and its receiver, Jewett, acquired, at various prices, by

negotiation and by purchase, practically all of the stock of the Suspension Bridge Company, except what the plaintiffs possessed. With this ownership of the capital stock the management of the Erie Company, and of its successors in interest, obtained complete control and have elected directors in their company's interest. In 1878 the defendant the New York, Lake Erie and Western Railroad Company became the owner of the railroad properties and assets of the Erie Company, by conveyance from a purchasing committee, who bought them in at a sale in mortgage foreclosure, and included in this conveyance was the leased property of the Suspension Bridge and Erie Junction Railroad Company. The grantee also covenanted to assume the payment of all of the receiver's liabilities. At all times the Erie Company, its receiver and its successor, the present company, have operated the Suspension Bridge road under the lease, as an integral part of the Erie road ; but they never have paid, since January 1, 1872, other rent than $35,000, semi-annually, in the shape of the interest due upon the lessor's bonds. It was found by the trial court that at no time would thirty per cent of the earnings from the operation of the leased road equal the guaranteed rent.

The lessor company's stockholders had, in August, 1872, requested its board of directors to take the proper steps to collect the amount due by the terms of the lease, and that board did direct a formal demand to be made and proceedings to be taken. It was subsequent to these steps that measures were taken and negotiations entered into by the Erie Company to purchase the whole of the lessor's stock. The trial court found that the "syndicate, consisting of members of the board of directors of the Suspension Bridge, etc., Company and of the Erie Railway Company, fraudulently caused the contract to be made * * * with Mortimer Smith," and its assignment to themselves, and that it was designed for their benefit and gain solely, and to the loss of the Erie and Suspension Bridge Companies. He found that the execution of the lease and of the guarantees was fraudulently induced by the syndicate. His conclusion, upon all the facts, was that the

complaint should be dismissed, and the defendants had judgment accordingly. At General Term the judgment was sustained.

The opinion of the learned judge who spoke for that court, proceeded mainly upon the ground that as there were four persons interested in the contract for the building of the road and in the receipt of the bonds and the stock payable therefor, who were directors in each of the companies, it could confer no rights and, to use his words, "the agreement of lease created no binding obligation." It was "incapable of performance through the instrumentality of courts of justice." Rescission, in his opinion, was not required to enable the parties to the agreement to avail themselves of the invalidity of the lease and continued possession does not aid the right to recover rental moneys.

*Elihu Root* for appellants. The lease, although voidable, was not void. (*Foster* v. *O., etc., R. Co.,* 13 C. B. 200; *Ernest* v. *Nichols,* 6 H. L. Cas. 408; *U. S. R. S. Co.* v. *A. & G. W. R. R. Co.,* 34 Ohio St. 450; 2 Pom. Eq. Juris. §§ 958, 959, 964; *Thomas* v. *B., etc., R. R. Co.,* 109 U. S. 522; *Duncomb* v. *N. Y. H. & N. R. R. Co.,* 84 N. Y. 193; *Risley* v. *I., etc., R. R. Co.,* 62 id. 240; *Barnes* v. *Brown,* 30 id. 527; *Stewart* v. *L. V. R. R. Co.,* 38 N. J. L. 505; *Kelley* v. *N. H. R. R. Co.,* 141 Mass. 499; *U. P. R. R. Co.* v. *C. M. Co.,* 135 id. 376; *Paterson* v. *P. T. H. Co.,* 38 Sc. Jur. 385; *Alexander* v. *Williams,* 14 Mo. App. 27; *Booth* v. *Robinson,* 55 Md. 441; *Buel* v. *Buckingham,* 16 Ia. 284; Whart. on Agency, §§ 244, 245.) The right to avoid the lease which the lessee undoubtedly at one time had, has been lost. (*Grymes* v. *Sanders,* 93 U. S. 63; *Baird* v. *Mayor, etc.,* 96 N. Y. 567.) The Bridge Company is entirely under the control of the Western Company, and is, therefore, unable to maintain its own rights against that company. If, therefore, the plaintiffs are stockholders of the Bridge Company, they are entitled to act as its champions in prosecuting its claim against the Western Company. (*Dodge* v. *Woolsey,* 18 How. Pr. 331; *Brinkerhoff* v. *Bostwick,* 88 N. Y. 52; *Heath* v. *E. R. Co.,* 8 Blatchf. 394; *Anderton* v. *Wolf,* 41 Hun, 571;

*Robinson* v. *Smith*, 3 Paige, 222.)    As between the plaintiffs and the Bridge Company, the plaintiffs are stockholders and entitled to all the rights of stockholders of that company. (*Christenden* v. *Eno*, 106 N. Y. 97; *In re Gould Co.*, L. R. [11 Ch. Div.] 709; *Van Cott* v. *Van Brunt*, 82 N. Y. 535; *Scovill* v. *Thayer*, 105 U. S. 143; *Lorillard* v. *Clyde*, 86 N. Y. 388; *In re A. L. T., etc., Co.*, L. R. [14 Ch. Div.] 395; *Harrison* v. *U. P. R. R. Co.*, 13 Fed. Rep. 522; *Kent* v. *Q. M. Co.*, 78 N. Y. 159.)    There is no ground upon which the Western Company is entitled to object to the enforcement of the Bridge Company's rights by the plaintiffs.    (Bigelow on Estoppel [5th ed.] 442; *Robertson* v. *Pickerell*, 109 U. S. 613; *Peters* v. *Bowman*, 98 id. 59, 60; *Brazee* v. *Schofield*, 124 id. 496; *Van Cott* v. *Van Brunt*, 82 N. Y. 539.)    It is, not material that the trial court failed to find the conspiracy alleged in the complaint.    (*Dodge* v. *Woolsey*, 18 How. Pr. 331; *Brinkerhoff* v. *Bostwick*, 88 N. Y. 52; *Hand* v. *Kennedy*, 83 id. 149; *Claflin* v. *Ostrom*, 54 id. 581; *Lawrence* v. *Fox*, 20 id. 268; *Neftel* v. *Lightstone*, 77 id. 96; *Sternberger* v. *McGovern*, 56 id. 12; *Conaughty* v. *Nichols*, 42 id. 83.)

*William W. MacFarland* for respondents.    The several transactions and instruments mentioned in the statement and set forth in the complaint as the foundation of the action were, and are, illegal, fraudulent and void, and created no right of action or title to relief in the plaintiffs.    (*T. L. O. Co.* v. *Marbury*, 91 U. S. 589; *Munson* v. *S. G. & C. R. R. Co.*, 103 N. Y. 158; *Duncombe* v. *N. Y. H. & N. R. R. Co.*, 84 id. 190; *Hoyle* v. *P. & M. R. R. Co.*, 54 id. 314; *Thomas* v. *B. F. K. & P. R. R. Co.*, 109 U. S. 522; *Wardell* v. *R. R. Co.*, 103 id. 651; *Bell* v. *Legett*, 7 N. Y. 176; *Sedgwick* v. *Stanton*, 14 id. 289.)    No action or inaction on the part of either company validated the fraudulent and illegal shares and lease.    (*Wardell* v. *U. P. R. R. Co.*, 4 Dill. 330.)    A conspiracy is a tort, and its essence is a concert and combination to defraud.    (*Place* v. *Winter*, 65 N. Y. 95.)    But it is impossible to make a tort out of a breach of contract.    (*Rich* v. *N. Y.*

*C. & H. R. R. R. Co.*, 87 N. Y. 382.)   In such a case the conspiracy must be proved or the plaintiffs will fail.   (*Newdecker* v. *Kohlberg*, 81 N. Y. 296 ; *Stevens* v. *Mayor*, etc., 48 id. 296.)

. Gray, J.   There is no conflict of evidence, nor any dispute about the facts, which I have stated above.   The plaintiffs' appeal questions the correctness of the legal conclusion which has been deduced from these facts.   In reviewing that conclusion, we should not lose sight of what the action was intended to accomplish, and that was, simply stated, to compel the New York, Lake Erie and Western Railroad Company to pay, for the use and operation of the railroad and property of the Suspension Bridge and Erie Junction Railroad Company, the consideration, or rental moneys, secured to be paid by the contract of lease of that company, through which the right of possession and use was derived.   This is not an action to compel a specific performance of some executory agreement, but it is one to compel the defendant, as the successor in interest of the lessee company, to pay that which the contract of lease bound the lessee, and its successors, to pay as a condition of the right to have and to operate the leased road.   The question, which is raised by the defense to the action, is whether the fraudulent nature of the acts and proceedings, by which the railroad was constructed and the contract of lease effected, is a matter which has reached in its vice so far as, at this day, to disable the plaintiffs from enforcing, against the lessee of their company, the payment of the full amount of rental stipulated for in the lease.   I cannot think that such is the result, or that the law intends such consequences to attach as the respondent claims and as the courts below have held.   There is something repugnant to our sense of justice, and a seeming subversion of ideas respecting property rights, in the position that property may be retained and enjoyed, and payment of the stipulated rental therefor refused by its holder, on the plea of fraudulent practices, or because of the immoral conduct involved in the making of the contract by which the property was transferred and the obligation to pay

imposed.' We would naturally reason that these considerations furnished grounds for repudiating a transaction so tainted, and for refusing to remain under the obligation to keep and pay for the use of the property, but our reason fails to make it evident how, with knowledge of the fraud or immorality practiced, and with opportunity to act in repudiation, the party may retain possession, and enjoy the advantages which possession gives, and, nevertheless, refuse the payment, which was the condition of the right to its possession and use. Fraud furnishes ground for rescinding a contract and for avoiding an obligation imposed, but I do not understand that, while serving to divest the obligation, it can be availed of as a means of continuing the possession of the property which the contract, legal in itself, was designed to and did transfer.

I assume that the right of the plaintiffs to maintain an action to enforce the claims of the Suspension Bridge Company is not disputed, save in the respects that the general issue of stock is alleged to have been fraudulent and void, and that the existence of any enforceable rights is denied. Nor could their right as stockholders to prosecute such a cause of action be seriously questioned; inasmuch as their corporation is wholly under the control of its lessee, the defendant proceeded against. Its directors are elected and manage its affairs solely in the interest of the lessee company. The lessor company as a corporation is, therefore, in no position to assert any rights against the lessee, and, under well-settled principles, if there are rights, which are suffered to remain unenforced, its stockholders may assert and maintain them in equity. (Ang. & A. Corps. § 312; *Robinson* v. *Smith*, 3 Paige, 233; *Brinckerhoff* v. *Bostwick*, 88 N. Y. 52, 56; *Detroit* v. *Dean*, 106 U. S. 537.)

The respondent has questioned the legality, or validity, of the issue of shares upon which plaintiffs base their right to sue. I do not think it is in a position to raise that question and for several manifest reasons. All of the stock and bonds were issued in payment for the construction of the railroad, and were taken by a syndicate of persons, who assumed the contract for the work. It is true that that syndicate was made

up of members of the board of directors, but, as the members of the syndicate were practically the company and composed the whole number of stockholders, there was no one to object, and the manner in which they chose to divide up their interests in the proprietorship of the corporation and to represent them in shares concerned only themselves.   No principle of law forbade the company agreeing to pay for the construction of its railroad in the way or in the amount it did.   ( *Van Cott* v. *Van Brunt*, 82 N. Y. 535.)   If the company's directors were interested in the work and profits of construction, and evaded a direct contract through the form or device of an intermediary contractor, that was a matter for the company, or for its stockholders, to take hold of.   But the stockholders and the members of the syndicate were the same persons, and, however wrong the transaction might be if other persons were concerned, here no injury was effected to anyone interested in the corporation.   And however illegal the transaction, there was no person apparently to complain of it.   As the stock was issued as a part of the consideration for construction, it cannot be said that it was taken without value given, and the mode of its apportionment or division concerned only those interested in the contract, through which it was received as payment.

We may concede that the contract was voidable, as a scheme concocted by the directors for sharing in the profits of construction ; but the difficulty is that all the members of the corporation were assenting to it.   There was, therefore, in fact no fraud practiced upon the company.   Practically, the promoters of the corporation in this way placed a valuation upon the corporate properties and franchises, which the contribution and expenditure of their money created ; and the fact that they were created for an expenditure less than the par value of the aggregate issues of capital stock and bonds does not affect the question at all.   The stock so issued constitutes the only stock of the company, and is represented in the holdings of the plaintiffs and of this respondent, the New York, Lake Erie and Western Railroad Company.   Their shares stand on precisely the same footing as to validity.   The plain-

tiffs were parties to the construction contract, and the original holders of the respondent's shares received their stock in the same way and for the same consideration.

The contention is, therefore, brought to this point: Did the Suspension Bridge Company have a cause of action against the present successor in interest of its original lessee? All questions are eliminated from the controversy as to the liability of the New York, Lake Erie and Western Railroad Company to the Suspension Bridge Company, save the one of whether the taint of original fraud in the procurement of the lease operates to prevent the enforcement of the obligations of that instrument. That the contract of lease was voidable and quite indefensible, because of the immoral conduct of directors, who abused their trust in procuring its execution, I quite concede. The proofs could lead to no other finding than that the lease and the rental guarantees were the work of a combination, or syndicate, composed of members from the boards of directors of the two companies, who caused the same to be made by the Erie Company for purposes of their own individual gain and in fraud of that company's rights. The identity of certain of the directors of each company, when the lease was made; the interest of four of these common directors in the contract for the construction of the Suspension Bridge road and in the stock and bonds to be guaranteed, as a condition of the leasing of the road, stamped the whole transaction as a fraud upon the Erie Company and brought it under the condemnation of the rule, which forbids those who fill fiduciary positions from making use of them to benefit their personal interests. This rule is deservedly strict in its requirements and operation. It extends to all transactions where the individual's personal interest may be brought into conflict with his acts in a fiduciary capacity, and it works independently of the questions of whether there was fraud, or whether there was a good intention. Where the possibility of such a conflict exists, there is the danger intended to be guarded against by the absoluteness of the rule. (*Davoue* v. *Fanning*, 2 Johns. Ch. 260; *Barnes* v. *Brown*, 80 N. Y. 527.) But the rule does

not operate to avoid *ab initio* all transactions of a trustee, where he is interested ; but is generally limited in its operation to rendering them voidable, at the election of the party whose interests are concerned in the question of their affirmance or disaffirmance. If, therefore, nothing is done in avoidance, the transaction remains. If knowledge and opportunity concur, whereupon to move, delay, if unreasonable, or attended by retention and enjoyment of the results of the transaction, may be deemed equivalent to an adoption and ratification of that which before was the subject for action, in repudiation of any obligation. The rule is not designed to work injustice, but to protect those who repose confidence, voluntarily or perforce, in others holding towards them fiduciary positions and to whose care have been confided the management and custody of property and of interests. (*Duncomb* v. *N. Y., etc., R. R. Co.*, 84 N. Y. 193, 199.)

But that the plaintiffs were parties to a scheme for imposing a continuing obligation upon the Erie Company, and knew, or were chargeable with knowledge of the fraudulent devices to bring about that obligation, are not sufficient, at this day, as facts in defense of this action. It is the respondent's own attitude and the conduct and acts of its predecessor in interest, which create the difficulty in defending against the demand of these plaintiffs.

The vice in the original transaction, from the collusion between a combination of the common directors with others, does not necessarily so inhere in the agreements of the lease as to prevent ratification, or to survive acts amounting in effect to acquiescence and waiver on the part of the Erie Company and its successors in interest. It may be adverted to here that the particular loss and disadvantage, which resulted to the Erie Company from these transactions in 1870, were in the imposition upon it of the burden of a rental greater in amount than it would have been if it had been measured by a percentage upon the actual ascertained cost of construction. There is no question but that the road was deemed to be an important construction for the Erie Company, and it appears affirma-

tively in this record that, as a link in the connections of that company, it was a most valuable adjunct. From March, 1872, the time when a change occurred in the management of the Erie Company, and payment was refused of that portion of the rental represented by the guaranty of dividends upon the stock, nothing was done to avoid and rescind the contract of lease. Then was the opportunity to take advantage of the legal fraud in its procurement, and there must have been knowledge then as to the facts surrounding the lease, for the refusal to pay upon the stock evidences it, as does the subsequent effort to buy up the stock. But, as appears from a report of the president, Mr. Dix, to the stockholders, in July, 1872, this leased road was indispensable as a route to Niagara Falls and as a connection with Canadian roads. When, in 1875, the Erie road was operated by a receiver, he continued the use of this leased line; reporting, with respect to it, that it was a necessity to the Erie road, and that it was not thought best to abandon it, but rather to reduce the rental by buying up its capital stock. And, finally, when, in 1878, two years before this action was commenced, the New York, Lake Erie and Western Railroad Company was organized and took over the road, properties and assets of the Erie Company, there was included in the purchase thereof this lease, and the leased properties were operated in connection with Erie's main line. If these facts do not clearly evidence an election to abide by the lease which had been made to the Erie Company, and to waive any irregularities or fraud in its execution, it is not easy to understand how such acts could ever be evidenced. The ratification of this lease was not necessary to be shown by any particular or peculiar act. A course of conduct and the retention of the property might be sufficient to make it a valid contract by acquiescence. To be silent and to hold and use the leased property as its own were acts incompatible with the maintenance by the Erie Company of a serious claim to rescind for fraud. I think it quite incompatible with the principles upon which equity proceeds to hold and use property, the only right to which is derived through a contract of

lease, and to refuse payment of a part of the rent stipulated in the contract on the ground of the existence of fraud in its procurement. The contract was not severable, nor the consideration apportionable. If it was bad for some fraud in the agreement, then it was voidable as a whole. The Erie Company, or its successor, could not adopt in part and repudiate in part. They could not be heard to say: We want and will keep this railroad branch, but we will not pay the whole of the rental agreed upon for its use in the lease. We will not pay the guaranteed dividends upon the capital stock, and if an attempt is made to force us to pay them, we will set up fraud in the making of the lease, and will assail the complainants' standing as stockholders. There can be no such fast and loose playing with legal rights.

I have said that this contract of lease was voidable and not void, and, therefore, could be and was, upon the showing of this record, validated by acquiescence and adoption. It was a good enough contract at law, but because of the immorality of directors, common to both contracting companies, combining to procure the execution of a contract in which they were personally interested, a court of equity could interfere and set it aside at the instance of the injured party. The right, however, to invoke the equitable interference of the courts depends upon the circumstances of the case, and aid will be denied where, in a case like the present one, the contract has been executed, unless the party claiming to be injured acts diligently, in asserting a right to rescind, and honestly, by yielding up what came to it and continues to be held and enjoyed under the contract.

The cases are many in which has been discussed the equitable rule that such contracts are not absolutely void, but only voidable, and, notwithstanding the vice or immorality which tainted their origin, may be validated. The opinions in *Thomas* v. *Brownville, etc., R. R. Co.* (109 U. S. 522); *Twin Lick Oil Co.* v. *Marbury* (91 id. 587); *Duncomb* v. *N. Y., etc., R. R. Co.* (84 N. Y. 193); *Risley* v. *Indianapolis, etc., R. R. Co.* (62 id. 240), and *Barnes* v. *Brown* (80 id. 527), are

sufficient to be referred to upon that subject, and further elaboration is quite unnecessary.

The authorities relied upon by the court below at General Term do not conflict with our views of this case. *Munson* v. *R. R. Co.* (103 N. Y. 58) was an action to compel the specific performance of an agreement affected by the vice that a director of the defendant corporation was a party to it and participated in the action of the corporation in assuming the obligation. The agreement, in substance, was for the sale of certain railroad property held by the plaintiffs, and its purchase by the defendant corporation. The court, it was there held, would not aid in the enforcement of this executory contract, for it was "repugnant to the great rule of law which invalidates all contracts made by a trustee or fiduciary, in which he is personally interested, at the election of the party he represents." This is not the present case, where the contract was executed and its results retained and enjoyed long after the opportunity for repudiating it because of the facts underlying the transaction.

In the case of *Wardell* v. *R. R. Co.* (103 U. S. 651), the agreement sought to be enforced was tainted with the same vice, in the collusion of directors. The agreement licensed certain parties to prospect and to open and to operate coal mines along the line of the railroad, and leased the company's coal lands for a term of years, and bound the company to purchase the coal mined at certain rates. A company was formed and a majority of its stock was taken by six of the railroad company's directors, and the contract referred to was assigned to the coal company. Subsequently, officers of the railroad company seized upon the coal company's property and books, and held them. Hence the suit by plaintiffs. The facts are not stated with fullness, but, presumably, the seizure was at the instance of a new management of the Union Pacific Railroad Company, who, upon discovering the fraudulent combination of the former directors to make a profit in working the company's properties, repudiated the contract and repossessed the company of its lands. As the appellants'

counsel suggests in his argument, the point of the decision condemning the transaction and refusing to sustain the plaintiffs' claim is found in the remark of Mr. Justice FIELD, that the law will relieve against such transactions "whenever their enforcement is seasonably resisted." The case is not parallel to this case, where, concededly, no attempt has ever been made to annul the contract of lease and no offer made to return the property. The defendants had the right to elect to continue the use of this leased road, notwithstanding the causes which existed for their refusing to be bound by the contract, through which it was transferred. That election was evidenced in many ways and a cause of action accrued to the lessor company, upon the failure to make such payment as the contract of lease called for, which inured to a stockholder's benefit, when the direction of his company's affairs passed into hostile hands.

It is quite a misapprehension of the matter to treat the contract of lease as in itself illegal and, therefore, incapable of enforcement in the courts. The contract was not illegal in itself, but, on the contrary, was one the companies could enter into, through the action of their directors, with perfect propriety. What happened, as the result of the combination of persons and of directors common to each contracting company, was that that fact infected the agreement, and impaired its binding force as an obligation. It did not annul or destroy it, but subjected it to the condemnation of the law. A court of equity could give relief against it, but whether it would exert its power would necessarily depend upon the circumstances of the case, and the conduct of the parties. Delay and conduct inconsistent with a purpose to throw up the lease are sufficient reasons for holding the contract to have been validated and the objection to it waived.

For the reasons expressed, it was error for the trial court to have dismissed the complaint on the merits, and, therefore, the judgments should be reversed and a new trial ordered, with costs to abide the event.

All concur.

Judgment reversed.