At the same time, the plaintiff signed a formal agreement witnessed by Kugler, and unexecuted by defendant, which contained a provision similar to that first quoted from the application. The application was not accepted according to its terms, and no agreement was executed by defendant. The plaintiff knew the terms of the instruments. He relied upon the alleged oral statement by Kugler or Fuller, or both. Yet he knew that the defendant could not be so bound, inasmuch as he had stipulated that the agreement should not be binding until accepted by an executive officer, and that there should not be any modification of it by an agent or employé of the company "unless incorporated in writing herein before such acceptance." But he did rely, as he says, on what he considered the assurances of Kugler and Fuller, and on that predicates his cause of action. Plaintiff knew that the permit for service could not be granted until the line was established, and that this could not be until the line had been built with the consents of the property owners. On May 28th the company's vice president wrote Sezen that the matter of extension had been taken up, that "from present indications it seems that we may experience a long delay," and that Mr. Kugler had been instructed "to keep you posted as to the progress and as to when the mains may possibly reach your premises," but this did not undo the terms of the application made thereafter, when the plaintiff bound himself by the stipulations stated. The defendant acted in entire good faith, but could not furnish the service, and the plaintiff knew that it was not obliged to do so until it bound itself by the agreement.

The judgment and order should be reversed, and a new trial ordered; costs to abide the event. All concur.

---

### In re DE VANY.

(Supreme Court, Appellate Division, Third Department. November 29, 1911.)

1. EXECUTORS AND ADMINISTRATORS (§ 504*)—SETTLEMENTS—JURISDICTION OF SURROGATE'S COURT.

In the absence of any statutory requirement or general rule requiring the filing of a specific objection by a party contesting an executor's account, the surrogate has the power, of his own motion, with or without a petition or suggestion from any one, to require a judicial settlement of the accounts of an executor, and, after obtaining jurisdiction of the person, to proceed to settle the account, and in such proceeding may surcharge the executor's account.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 504.*]

2. GIFTS (§ 36*)—VALIDITY.

A voluntary gift is as fully protected by law as a transfer for value consideration, and can be assailed only by parties interested in a court of equity for fraud, undue influence, or unfairness.

[Ed. Note.—For other cases, see Gifts, Dec. Dig. § 36.*]

3. EXECUTORS AND ADMINISTRATORS (§ 115*) — INDIVIDUAL PROFIT FROM TRANSACTION—SURCHARGING ACCOUNT.

An executor of a will which gave a legacy of $2,500 advanced to the legatee $1,700 of his own money, and took a receipt for $300, the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

price of a colt belonging to the estate, purchased by her from the estate, and afterwards paid to her the sum of $381, the balance of the legacy after deducting the inheritance tax, and took a release; but she immediately handed the amount back to the executor, by whom it was retained, it being his understanding that the amount was voluntarily paid to him because of his accommodation in making the advance, and for the use of the money advanced. *Held* that, since an executor may not take any benefit beyond his legal compensation by virtue of his office, his account was properly surcharged with such amount, less the interest on the amount advanced to the date of the settlement with the legatee.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 467, 468; Dec. Dig. § 115.*]

Betts, J., dissenting.

Appeal from Surrogate's Court, Ulster County.

Judicial settlement of the accounts of John R. De Vany, executor of Harry S. Gordon, deceased. From so much of the decree of the Surrogate's Court as surcharges the account of the executor with the sum of $381, the executor appeals. Modified and affirmed.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, SEWELL, and BETTS, JJ.

John J. Linson, for appellant.
Howard Chipp, for respondent.

SEWELL, J. Harry S. Gordon died leaving a will which was admitted to probate by the surrogate of Ulster county December 15, 1908, and on that day letters testamentary were issued to the appellant, the executor therein named. By the fifth clause of the will Edith R. Gordon was bequeathed $2,500. This legacy was subject to an inheritance tax of $118.70. On the 15th day of May, 1909, the executor advanced to the legatee $1,700 of his own money, and took her receipt for $300, the price of a colt, belonging to the estate, purchased either by her or her husband. The executor testified that the legatee at that time offered to take $2,000 for the legacy, and that some time thereafter she executed and delivered to him an assignment in blank of the legacy, and a power of attorney, authorizing him to pledge or transfer it for the sum of $2,000; that he did not assign or pledge the legacy, but returned the papers to her on the 20th day of January, 1910, when he went to Popes Creek, Md., where the legatee resided, and paid her the sum of $381.25, the balance of her legacy, and took her release. The surrogate found that at that time he paid her $381.25 in cash, and that "Edith Gordon immediately handed back to said executor $381 of the same money so paid her, which said executor retained and still retains," and "that said moneys were so paid to and received and retained by said executor because of his having advanced said legatee said sum of $2,000 for her said legacy." As a conclusion of law the surrogate found that the sum of $381 retained by the executor belonged to the estate, and that he should be charged with that sum in the decree.

[1] The executor contends that, if he is in the wrong in retaining the moneys, the wrong is against the legatee, and that, in the absence

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of an objection by her, the surrogate was not called upon to decide that question, or to surcharge his account with the amount retained by him.

There is no statutory requirement or general rule requiring the filing of specific objection by a party contesting an account. The surrogate has the power on his own motion, with or without a petition or suggestion, from any one, to require a judicial settlement of the accounts of an executor or administrator, and, after obtaining jurisdiction of the person, to proceed and examine into the account and to settle and adjust the same.

In Wigand v. Dejonge, 8 Abb. N. C. (N. Y.) 260, it was held that the act of passing an account of an executor is a judicial act on the part of the surrogate, even when no objections are made to the account, and in doing so he exercises that power over trust formerly exercised by the old court of chancery, and, where infants are interested in the accounts, he is bound to investigate and take charge of their interests as their ultimate guardian.

The only question presented, therefore, is whether or not the account should be surcharged with the moneys which were paid or delivered by the executor to the legatee and immediately thereafter returned by her to him.

[2] The appellant has cited cases which support his contention that a voluntary gift is as much protected by law as is a transfer for a full consideration, and that it can be assailed only by parties interested in a court of equity for fraud, undue influences, or unfairness. This is, without doubt, the rule, but it is not applicable to the present case, because there was no evidence tending to show that the transaction between the legatee and the executor was a gift to the executor. On the contrary, the evidence was of such a character as to justify the surrogate in finding that the money was paid to and received by the executor on account of the advancement.

[3] All the evidence as to the transaction between the executor and the legatee was given by the executor himself. He testified that he told the legatee—

"at the time she was entirely too liberal and magnanimous, and offered to pay it back. She stated that was what she was willing to pay any one else; that I had befriended her, and was glad that I got the benefit, and under the circumstances I accepted. * * * I do not know what she paid me for. There was some other consultations and matters of importance I went over with her, but I did not charge her and never intended to, but she did what I have told you for my trouble, my expenses, my favor, and my accommodating her by advancing this $2,000 myself and the trouble I had had. * * * It was paid to me as I understand for the use of my $2,000, for the trouble and expense that I had been to at her request, and for her accommodation, and for advice and information possibly that I had given her in reference to the estate and its condition; what should be done or what she desired done in behalf of her children with the farm and matters of that kind."

The question as to whether an executor is bound to account for money received under such circumstances is not an open one, and it matters not that no actual fraud was found. It was said in Fulton v. Whitney, 66 N. Y. 555, that:

"The object of the rule which precludes trustees from dealing for their own benefit, in matters to which their trust relates, is to prevent secret fraud by removing all inducements to attempt them."

The rule prohibiting an executor or other trustee from managing the affairs of the trust or dealing with the trust property so as to gain any advantage directly or indirectly for himself beyond his lawful compensation is well supported by the decisions of the courts of this state. In the case of McClure v. Law, 161 N. Y. 78, 55 N. E. 388, 76 Am. St. Rep. 262, it was held that money received from an outsider by a director and president of an assessment life insurance company for procuring the outsider and his friends to be elected directors and given the control and management is money obtained by virtue of his office for which he must account to the corporation. The court there cited with approval Perry on Trusts, § 427:

"Trustees hold a position of trust and confidence, the legal title to the trust property is in them, and generally its whole management and control is in their hands. * * * They cannot use the trust property nor their relation to it for their own personal advantage. All the power and the influence which the possession of the trust fund gives must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emoluments of the trustees. * * * So, where a trustee retired from the office in consideration that his successor paid him a sum of money, it was held that the money so paid must be treated as a part of the trust estate, and that the trustee must account for it as he could make no profit directly or indirectly from the trust property or from the position or office of trustee."

The court also said:

"In Cook on Corporations, § 650, it is said: 'It is a well-established principle of law that a director commits a breach of trust in accepting a secret gift or secret pay from a person who is contracting or has contracted with the corporation, and that the corporation may compel the director to turn over to it all the money or property so received by him.'"

In the case of Carpenter v. Taylor, 164 N. Y. 171, 58 N. E. 53, the Court of Appeals said:

"A trustee who holds the title to property for the benefit of others cannot use his position for his personal advantage. He cannot make profit for himself in the execution of his trust. He cannot ordinarily deal with the beneficiaries or parties interested in the estate so as to acquire the ownership of the trust property. * * * In such cases the trustee occupies the dominant position, and the beneficiary or person interested in the estate is, in some respect, subject to his power and influence. For obvious reasons, the disability of the trustee to bargain with the beneficiary for a share or interest in the property, whether in the form of compensation or otherwise, is absolute in order to avoid the possibility of fraud. In such cases the law acts upon the principle that the temptation of self-interest is too powerful and insinuating to be trusted."

In the Matter of Schroeder, 113 App. Div. 217, 99 N. Y. Supp. 186, the court said this rule is most salutary:

"Persons holding fiduciary positions in the many trust relations which modern society has produced should be held to the strictest accountability. The community should be given to understand that the courts of this state will hold trustees to the highest standard of straight conduct, and will not permit them to make by virtue of their trusts a private and personal profit beyond the compensation allowed by law."

Any other rule would permit an executor to purchase legacies bequeathed by his testator at a discount and profit by paying himself in full. Such a practice would open the door to the greatest fraud. The only proper and safe rule to follow is to hold that an executor shall not make any profit by the discount of a legacy, and, if he does, it shall inure to the benefit of the estate whether the legatee complains of unfair treatment or not.

It is to be observed, however, that all of the $381 with which the executor was charged was not personal gain or profit. He was without the use of the $1,700 advanced by him from May 15, 1909, to January 20, 1910. We think that he had a right to receive the lawful interest thereon during that period, which amounts to the sum of $69.70.

It follows that his account should have been surcharged with only the sum of $311.30, and that the decree of the surrogate should, therefore, be modified accordingly, and, as so modified, affirmed without costs to either party. All concur, except BETTS, J., dissenting in opinion.

BETTS, J. (dissenting). Harry S. Gordon died October 16, 1908, in Ulster county. His will was proved December 15, 1908. Amongst other provisions the will contained this:

"Fifth. I give, devise and bequeath unto Edith Gordon, wife of William J. Gordon, the sum of Twenty-five Hundred Dollars ($2,500.00)."

This legacy was properly payable to Edith Gordon December 15, 1909. Code Civ. Proc. § 2721. Edith Gordon resided in Maryland. Some time prior to May 15, 1909, her residence was burned at Pope's Creek, and she lost everything, escaping at midnight in her nightclothes from the fire. Shortly after the fire she met the executor, and desired him to pay her legacy. This he could not do under the statute. It was then suggested that an effort should be made to raise money by an assignment or pledge or hypothecation of the legacy for the sum of $2,000. Edith Gordon tried unsuccessfully to raise this amount. The executor did not succeed in raising the amount for her, but on the 15th of May, 1909, he paid said Edith Gordon $1,700 of his own money. She or her husband had purchased for $300 a colt from the estate, which was unpaid for, and which was at that time credited to her. Some time during the year such proceedings were had that the taxable transfer tax against this $2,500 was fixed at $118.75, which was paid by the executor, so that, so far as Mrs. Edith Gordon was concerned, she had received $2,118.75; $1,700 of it being the personal money of the executor. On or about January 20, 1910, the executor went to Maryland, where Edith Gordon resided, and paid her the balance of her legacy, which was $381.25, in cash, whereupon Mrs. Gordon gave that money back to the executor, and he took it and still retains it. Mrs. Gordon executed a release on January 20, 1910, releasing the executor and the estate from any and all claims under the will of Harry S. Gordon. This was witnessed by W. J. Gordon, her husband, but was not acknowledged before a notary public, and later a more formal release was filed. Upon the

judicial settlement of the accounts of this executor in the Surrogate's Court, Edith Gordon was duly cited, but did not appear. Objection was made by a special guardian for certain infant legatees that the $381.25 given by Edith Gordon to John R. De Vany, the executor, should be credited to the estate and the executor's accounts charged therewith. These infants are not shown to have any interest whatever in the legacy to Edith Gordon, the Edith Gordon, the infant, being an entirely different person. Mrs. Edith Gordon, the legatee, filed no objections. The surrogate found:

"That said sum of $381 so received and retained by said executor belongs to the estate of said Harry S. Gordon, and said executor should be and is charged with said sum in the decree entered herein."

The decree followed this finding, so that we have the executor charged with $381, which was given to him by one of the legatees under the will of his testator, and that amount is passed to the credit of some persons who are entire strangers to this legacy.

The surrogate cites no authority for the action thus taken. The authorities cited by the attorney for the respondents on this appeal have no relation to the question that was before the surrogate. They are for the most part where a trustee of some kind has used the funds of the estate for his betterment. This executor did not do that. He advanced his individual funds to the legatee at her request. There is no question of fraud, misrepresentation, or deceit here, and the surrogate has so found:

"Sixth. That no fraud, misrepresentations, or deceit was made by the executor before or at the time of the said payment to the said Edith R. Gordon."

He could not well find otherwise because it was apparent the legatee knew the amount of her legacy. She gave two releases therefor in full, and she was cited to appear upon the final accounting, and could make objection if she so desired.

The decree provides that the balance remaining in the hands of the executor who continues as trustee shall be by him invested according to the terms of the will, and the net income received therefrom, together with the net income from the balance of the residuary estate, he paid to May K. Gordon. Thus, by the decree as entered, May K. Gordon, the wife of the deceased, will receive during her lifetime the income from money that in no wise belongs to her, and never did, and it will eventually be paid to residuary legatees whom the testator did not give it to, instead of being disposed of by Edith Gordon as testator intended.

Fulton v. Whitney, 66 N. Y. 548, which is quoted by the respondents, was a case where a trustee had purchased for his own benefit property belonging to the estate, and it was held that he could not do so, but that the purchase inured to the benefit of the cestui que trust. That is not this case, nor like it, but it does lay down the rule which precludes trustees from dealing for their own benefit in property of the estate and the reason for it. This executor did nothing wrong. He did not use the funds of the estate for his own benefit. To accommodate Mrs. Edith Gordon, he used $1,700 of his private

funds to help her before he could pay her from the estate, and she made him a present, and is not here disavowing it or complaining.

The decree proceeds on the theory that Edith Gordon did not receive all that she was entitled to, and yet the balance which it is claimed belonged to her is by the decree given to other parties. I think, after the payment to Edith Gordon of the amount of her legacy, it was hers to do as she chose with, and, until she makes some protest or expresses some dissatisfaction, other parties cannot by judicial decree be given any portion of her property which she saw fit to give to this executor. Barr v. N. Y., L. E. & W. R. R. Co., 125 N. Y. 263–275, 26 N. E. 145.

It follows that the decree of the surrogate should be reversed, with costs payable to the executor out of the estate.