## LEE et al. v. NATIONAL BANCSERVICE CORPORATION.

District Court, S. D. New York.

May 13, 1940.

Wasserman, Behr & Shagan, of New York City (M. J. Shagan, of New York City, of counsel), for plaintiffs.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for defendant.

GALSTON, District Judge.

The defendant, the National Bancservice Corporation, was organized under the laws of the State of Delaware on July 25, 1928, and as a holding company acquired the shares of stock of a number of printing plants owned or controlled by the plaintiffs.

The company seemed not to have prospered and as early as December 31, 1930, showed a net loss in operations of $397,-601.84. On or about March 1, 1930, the company had been compelled to issue its 6% gold notes in the aggregate principal sum of $500,000. Then again about a year later, at the insistence of banks to which the corporation was heavily indebted, the defendant was obliged to procure aid in its financial structure.

At that time the plaintiffs, Lord and Boll, who held notes of the defendant, given in consideration of the purchase of their properties, were called upon to assist and they did assist the company to make good the diminution of its net current assets by subordinating their notes, in the respective amounts of $32,-028.65 and $45,000; and Field, Glore & Co., and Colvin & Co. (who were · referred to in the record as the investment bankers), being heavily interested in the affairs of the company, agreed also to cooperate by making cash advances to take up the balance of such diminution of assets.

But again it became necessary to readjust the financial affairs of the corporation as disclosed by the report of the corporation for the year ending December 31, 1932. That report and a proposed plan for financial readjustment were distributed to the stockholders of the corporation. On March 31, 1933, there were meetings held of the directors and of the stockholders. At the meeting of the board of directors the officers were authorized to accept an offer of the banks to extend the bank loans on terms and conditions which included a requirement that all indebtedness of the corporation which had been subordinated pursuant to the agreement of April 29, 1931, be funded by the issuance of preferred stock, or part by preferred stock and other stock. This plan permitted the issuance of income or adjustment debenture bonds in a sum not to exceed $56,000 on condition too that such debenture obligations be subordinated to the indebtedness of the banks.

Pursuant to the plan, Boll exchanged his note of $45,000 for preferred and common stock and Lord entered into an agreement on April 30, 1933, with the defendant whereby he purchased the capital stock of the New York Monotype Composition Co., Inc., from the defend-

ant, and as part payment surrendered to the defendant his promissory notes.

As an inducement to Boll to become a party to the reorganization plan, the plaintiffs, Charles W. Boll, Demarest, Griswold, Lee and Rawll, entered into an agreement with him, dated March 31, 1933, from which it appears that Boll transferred to each of the parties thus named a one-seventh interest in the $45,-000 of notes held by him; and Boll and the others agreed to surrender to the defendant corporation their interest in the notes pursuant to the plan of reorganization. In addition each of the parties agreed to give Boll a promissory note in the sum of $6,428.57, dated April 1, 1933, and payable on or before three years from that date. As collateral security each of the parties of the second part agreed to deliver the 64 shares of preferred stock and 576 shares of the common stock to be received by each of the parties from the corporation.

In respect to the Lord note, each of the plaintiffs other than Charles S. Boll, to induce Lord to surrender his note of $32,028.65 when he purchased the Monotype Corporation, gave him a· promissory note for $2,287.76, dated April 1, 1933, due in three years, except that Demarest assumed Lee's share and gave Lord a note for double that amount. These notes aggregated $11,438.80 and were deposited by Lord with the defendant as collateral security for the purchase price of the Monotype Corporation. Later, on the conclusion of the exchange of general releases between Lord and the defendant, the defendant surrendered those notes to Lord.

There were some debenture notes held by the Elmira banks in the amount of $20,700. Pursuant to the 1933 plan, the Elmira banks exchanged those notes for new income debenture notes. On or about October 20, 1936, the plaintiff Rawll purchased those debenture notes from the Elmira banks at a price of $16,000, and those were thereafter exchanged for new 3% debentures due in 1941. It appears that thereafter and prior to maturity the defendant paid its obligation on the latter debentures and they were surrendered to the defendant.

Now the claim of the plaintiffs against the defendant corporation is that as a consideration to the plaintiffs for making their agreements with Lord, Boll and the

Elmira banks, the defendant corporation undertook to save the plaintiffs harmless from any loss or damage which they might sustain by reason of having entered into such agreements. Plaintiffs allege that they have sustained damage in the aggregate sum of $53,000 by failure of the corporation to meet its obligations to them. The defendant's promise was an oral agreement, plaintiffs say, made at a meeting of the board of directors at the time that the financial plan of readjustment was adopted, and the whole case of plaintiffs rests on the contention that such an oral undertaking was given and was in all respects valid.

The defendant denies in the first place that it made the agreement and insists that any oral agreement if made by interested directors was not binding on the corporation, and lastly that if the directors as interested parties perchance had authority to adopt a resolution binding the corporation, the agreement should have been in writing.

■ All of the plaintiffs are men of affairs and it is most difficult to understand that they had any justification for believing that at either of the meetings held on March 20, 1933, or March 31, 1933, any legal binding corporate action was taken which obligated the corporation to indemnify them against any loss arising out of their contracts with Boll, Lord or the Elmira banks. Undoubtedly there was a good deal of round-table discussion and it is wholly within the realm of possibilities that in the give and take of debate the president, Johnston, recommended that it was to the best interests of all of them, as stockholders or otherwise as parties in interest, to meet the terms and conditions demanded by the banks as a prerequisite for extending the indebtedness of the corporation. It is, of course, easy to understand the reluctance of Boll and Lord to convert their notes into shares of stock. Doubtless they had very good grounds for seeking to have the other plaintiffs, who had received cash and securities on the sale of their properties to the defendant corporation, cooperate by sharing, each on the basis of one-seventh; but in the circumstances, if these interested directors desired indemnity from the corporation, it is unlikely that they would have let the matter rest on a so-called gentlemen's agreement. I am the more disposed to believe that whatever was said was more by way of table discussion than by formal or specific agreement because there is no reference to the alleged agreement in the minutes of the meeting, nor indeed in any part of the minute book, nor in the plan of financial readjustment. There is no entry indeed in any of the company's books; nor was a report made thereof at any meeting of the stockholders.

As to what actually took place at the meeting there is some contradiction. Mr. Rawll testified that those present besides himself were Messrs. Lord, Charles S. Boll, Demarest, Griswold and Johnston, but it appeared that Bernhardt, another director, was present at the meeting of March 31, 1933, as was McQuaide, counsel for the defendant. The most that can be spelled out of the testimony of Rawll, Boll, Lord, Griswold and Demarest is that Johnston said to the plaintiffs: "You will be reimbursed for any loss on your obligations"—a statement that cannot justify the conclusion that Johnston intended that the corporation was to be bound.

The complaint alleges in respect to this promise: "That at the time the said plaintiffs assumed the aforesaid indebtedness to Boll and Lord, in or about the month of April 1933, it was understood and agreed between the plaintiffs and representatives of said investment bankers that in the event the claims of the commercial banks were paid in full, the defendant corporation would make an equitable adjustment to the extent of its ability to pay, and would to such an extent save the plaintiffs harmless from any loss by reason of the aforesaid assumption of said obligations of Boll and Lord."

■ There was no proof that the investment bankers had any authority to bind the corporation; and though Johnston, at the time that he was president of the defendant corporation was also a member of Field, Glore & Co., he could not, in the interest of Field, Glore & Co., have bound the corporation to any such agreement as the plaintiffs allege and have testified to.

Significant too is the circumstance that after the alleged oral promise was made, the plaintiffs, other than Charles W. Boll, remained as directors of the defendant for a period of three years, and

during that time made no claim regarding this alleged promise. At the various annual meetings of stockholders held during the period from 1933 to 1936 proxies from the plaintiffs were voted in approval of the annual reports, which included no reference to the alleged liability.

Finally the version of the alleged promise as given by plaintiffs is denied categorically by Bernhardt, Johnston and McQuaide. I cannot on the basis of the record find that the plaintiffs have proved the alleged contract by a fair preponderance of the evidence.

■ Another phase of the matter which must receive serious consideration is that if in effect the promise was made by the corporation and not, as the complaint alleges, by the investment bankers on behalf of the corporation, we find five of the seven directors present procuring a promise from the corporation constituting a secret preference; secret, for it was not disclosed either to the other creditors who assented to the 1933 plan nor to the stockholders who approved the plan. Such an agreement must be rigorously scrutinized. Hanover National Bank v. Blake, 142 N.Y. 404, 37 N.E. 519, 27 L.R.A. 33, 40 Am.St.Rep. 607. Directors occupy a trust office. Their primary obligation, indeed their whole duty, is to represent the corporation, which is a continuing entity. Their own interests must be subordinated. Therefore, any degree of preference shown them, even when consideration for the preference is established, must at least be in the open, so that all parties, creditors and stockholders alike, may know what is going on. Another view which cannot be ignored is that by the very nature of the corporate entity, disclosure of its financial obligations should have been revealed in current published reports so that all who dealt with the corporation thereafter could know what its financial liabilities were, contingent as well as current. Wardell v. Union Pacific Railroad Co., 103 U.S. 651, 26 L.Ed. 509; Barr v. New York Lake Erie & Western Railroad Co., 125 N.Y. 263, 26 N.E. 145; Heim v. Jobes, 8 Cir., 14 F.2d 29; In re Webster Loose Leaf Filing Co., D.C., 240 F. 779.

■ Another serious obstacle which the plaintiffs encounter, assuming the agreement to have been made, is that it was not in writing, nor was there any note or memorandum thereof subscribed by the corporation or by its lawful agent. In all the circumstances of the case, since the notes received by Boll and Lord from the other plaintiffs were to be payable in three years, it was at that time that the loss if any which they sustained would be determined. Assuming the existence of the agreement, the necessary inference must be that it was not to be performed within one year. The matter is clarified by the testimony given by Lord. He said, referring to the round-table discussion of the notes to be given to himself and Boll: "At that time I objected to the three-year clause in the notes and saw no reason for waiting three years. If these men were going to reimburse me for five-fifths of the loss of the notes, I saw no reason for waiting three years. Then there was a long discussion about the possibility of the company pulling out, and we all agreed that the company could not pull out in one year or two years; so I agreed to the three-year period."

But even if the loss were ascertainable before the maturity of the notes, the defendant's obligation to pay the loss was not to be performed until all the other creditors of the defendant had been paid, including the holders of the 4½% income indentures due April 1, 1936. The agreement, were it able to stand the preferential test heretofore suggested, would therefore fail because it was not expressed in writing. New York Personal Property Law, Consol.Laws, c. 41, § 31, subd. 1.

In conclusion it may be said that the alleged indemnity agreement with respect to the obligations of the Elmira banks is subject to the same legal and equitable defenses as have been discussed with respect to the Boll and Lord notes.

For the foregoing reasons the complaint will be dismissed.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion. The proposed findings of fact heretofore submitted by the defendant do not include findings in respect to the agreement made by the plaintiffs with Boll, Lord and the Elmira banks. Such findings should be added.