## WARDELL v. RAILROAD COMPANY.

1. The directors of a corporation are subject to the obligations which the law imposes upon trustees and agents.  They cannot, therefore, with respect to the same matters, act for themselves and for it, nor occupy a position in conflict with its interests.
2. Hence, a court will refuse to give effect to arrangements by directors of a railroad company to secure, at its expense, undue advantages to themselves, by forming, as an auxiliary to it, a new company, with the understanding that they or some of them shall become stockholders in it, and then that valuable contracts shall be given to it by the railroad company, in the profits of which they, as such stockholders, shall share.
3. The contract entered into July 16, 1868, by the Union Pacific Railroad Company, by direction of the executive committee of the board of directors, with Godfrey and Wardell (*infra*, p. 652), which the latter assigned, without consideration, to a new company, in which a majority of the stock was taken by six directors of the old company, declared to be fraudulent and void.

APPEAL from the Circuit Court of the United States for the District of Nebraska.

The facts are stated in the opinion of the court.

*Mr. James O. Broadhead* and *Mr. James M. Woolworth* for the appellant.

*Mr. Andrew J. Poppleton* for the appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

The road of the Union Pacific Railroad Company passes for its entire length, from Omaha on the Missouri River to Ogden in Utah, a distance of 1,036 miles, through a country almost destitute of timber fit for fuel.  During its construction, however, large deposits of coal, of excellent quality and easily

worked, were discovered in land along its line, from which abundant supplies for the use of the company could be obtained. The complainant represents that their extent, quality, and value were unknown, and that doubts were generally entertained as to their adequacy to meet the necessities of the company, until he had made explorations in June, 1868, and reported to its managers the information which he had thus acquired; and that upon that information the contract which has given rise to this suit was made, after much negotiation, between the company and himself and Cyrus O. Godfrey, with whom he had become associated in business. But in this respect he is mistaken. Though he may have imparted to the managers the information acquired by his explorations, the knowledge of the existence and general character of the deposits had been communicated to them years before by the engineers appointed to survey the route for the construction of the road. They had reported that coal in inexhaustible quantities, of suitable quality for the purposes of the company, was found so near the line of the road as to render its extraction and delivery easy and convenient. It is of little moment, however, whether the knowledge of the existence, character, extent, and accessibility of the deposits was obtained from the complainant or from others; it is sufficient that the directors of the Union Pacific Railroad Company, having the control and management of its road and business, were informed upon the subject at the time the contract mentioned was made. That contract was as follows : —

"This agreement, made this sixteenth day of July, in the year of our Lord one thousand eight hundred and sixty-eight, between the Union Pacific Railroad Company, by its proper officers, of the first part, and Cyrus O. Godfrey and Thomas Wardell, of the State of Missouri, or assigns, parties of the second part : —

"Witnesseth, that the said party of the first part agrees that the said parties of the second part may prospect at their own expense for coal on the whole line of the Union Pacific railway, and its branches and extensions, and open and operate any mines discovered, at their own expense; that said railroad company agrees to purchase of said parties of the second part all clean merchantable coal mined along its road, needful for engines, depots, shops, and

other purposes of the company, and to pay for the same the first two years at the rate of six dollars per ton; for the next three years at five dollars per ton; for the four years thereafter at four dollars per ton; and for the six years remaining at the rate of three dollars per ton, delivered upon the cars at the mines of the said party of the second part, and which shall not be less than ten per cent added to the cost of the same to the said party of the second part. This contract to be and remain in full force and effect for the full term of fifteen years from the date hereof.

"The said railroad company agrees to facilitate the operations of the said parties of the second part, in prospecting and otherwise, by means of such information as it may possess, and by furnishing free passes on its road to the agents of the parties of the second part, not exceeding six in number. Said railroad company further agrees to put in switches and the necessary side-tracks, at such points as may be mutually agreed upon, for the accommodation of the business of the said parties of the second part; that the said parties of the second part agree to make all necessary exertions to increase the demand and consumption of coal by outside parties along the line of said railroad, and to open and operate mines at such points where coal may be discovered, as may be desired by said railroad company; and to expend within the first five years from the date of this agreement, in the purchase and development of mines and mining lands, and improvements for the opening, successful and economical working of the same, not less than the sum of twenty thousand dollars; also to furnish for the use of the said railroad company good merchantable coal, and to pay all expenses for improvements for loading coal into cars. Any improvement desired by said railroad company in regard to the coal to be used by it shall be at the cost of said railroad company.

"In consideration of their exertions to increase the demand for coal, and the large sum to be expended in improvements, it is further agreed that the parties of the second part shall have the right to transport over the said railroad and its branches for the next fifteen years from the date of this agreement, coal for general consumption at the same freight that will be charged to others; but the said parties of the second part shall be entitled in consideration of services to be rendered as herein provided, to a drawback of twenty-five per cent on all sums charged for the transportation of coal.

"The said railroad company agrees to furnish the parties of the second part such cars as they may require in the operation of their

business, and to transport them as promptly as possible. This agreement to remain in force for fifteen years.

"The coal lands owned by said party of the first part are hereby leased for the full term of fifteen years to the said parties of the second part or their assigns, for the purpose of working the same as may seem to them profitable; said parties of the second part to pay for the first nine years a royalty of twenty-five cents per ton for each ton of coal taken from their lands, excepting always coal taken from entries, air-courses, or passage-ways, for which coal no royalty shall be paid; payments for the same being due and payable monthly.

"The royalty for the last six years of this lease shall be free, provided the price of coal to the railway company is reduced to three dollars per ton. If three dollars and twenty-five cents or more per ton, then in that case the royalty shall be as during the first nine years.

"In witness whereof, we have hereunto set our hands and seals, this the day and year first above mentioned.

(Signed)      "OLIVER AMES,

"*President of the Union Pacific R. R. Co.*

"C. O. GODFREY.

"THOMAS WARDELL."

This contract on the part of the railroad company was made by direction of the executive committee of the board of directors, of whom the president was one, and not by the board itself. It was never reported to the board for its consideration or action. But notwithstanding this defect, in August following the contractors, Wardell and Godfrey, entered upon its execution, and began work on several mines along the line of the road. Soon afterwards Godfrey transferred his interest to Wardell, perceiving, as the bill alleges, that sums beyond those stipulated would be required, and being alarmed at the risks which he believed he had assumed.

In January following (1869) a corporation under the laws of Nebraska, called the Wyoming Coal and Mining Company, was formed to develop and work the mines, having a capital stock of $500,000, divided into shares of $100 each, a majority of which was taken by six of the directors of the railroad company, one of whom was its president; and to it Wardell assigned his contract without any consideration.

The corporation continued the execution of the contract, Wardell, acting as its superintendent, secretary, and general manager, and delivered coal as needed by the railroad company up to the 13th of March, 1874, when the officers and agents of that company, by order of its directors, took forcible possession of the mines and of the books, papers, tools, and other personal property of the coal company, which they have held and used ever since.   Hence the present suit, which Wardell brings in his own name, alleging as a reason that a majority, if not all, of the directors and stockholders of the coal company, except himself, are also directors and stockholders of the railroad company, and that, therefore, he can obtain no relief by a suit in the name of the coal company.   He prays that an account may be taken of the amount due for the coal delivered to the railroad company; for drawback on freight from the date of the contract to the forcible seizure alleged; for coal extracted from the mines since their seizure; for the property of the coal company taken, and for the damages arising from the seizure and the attempted abrogation of the contract; and that the rights and interests of the several parties may be ascertained and declared; and for general relief.

To this bill the railroad company filed an answer, setting up in substance three defences: —

1st, That the contract of July 16, 1868, was a fraud upon the company; that it was made on its part by the executive committee of its board of directors, a majority of whom were, by previous agreement, to be equally interested with the contractors in it, and for that reason its terms were made so favorable to the contractors and unfavorable to the company as to enable the former to make large gains at the expense of the latter, and that the organization of the Wyoming Coal and Mining Company was a mere device to enable those directors to participate in the profits; and that, therefore, the contract was of no validity and binding obligation upon the company;

2d, That at the time of the seizure of the property the railroad company was the owner of nine-tenths of the stock of the coal company, and had become apprehensive that Wardell, its superintendent and manager, would not furnish the coal needed to run the trains; and,

3d, That since then the coal company and the railroad company, through their boards of directors, have had a settlement of their transactions, by which the contract of July 16, 1868, has been rescinded and the sum of $1,000,000 allowed to the coal company, and that the railroad company has set apart and tendered to the complainant $100,000 for his share in the coal company in that settlement.

The court below held that the contract of July 16, 1868, was a fraud upon the company, but that the complainant was, apart from it, entitled to some compensation for his time, skill, and services while engaged in taking out the coal, with the return of the money actually invested and compensation for its use, the amount to be credited with what he had actually received out of the business; and that at his election he could have an accounting upon that basis or take the $100,000 tendered by the company. Of the alternatives thus offered the complainant elected to take the $100,000 instead of having the accounting mentioned, but appealed to this court from the decree, contending that the contract itself was valid and that he is entitled to an accounting upon that hypothesis.

The evidence in the case justifies the conclusion of the court below as to the nature of the contract of July 16, 1868. It was evidently drawn more for the benefit of the contractors than for the interest of the company. The extent, value, and accessibility of the coal deposits along the line of the road of the company were, as stated above, well known at the time to its directors, having the immediate control and management of its business. Wardell, the principal contractor, informed those with whom he chiefly dealt in negotiating the contract that coal could be delivered to the company at a cost of two dollars per ton, yet the contract, which was to remain in force fifteen years, stipulated that the company should pay treble this amount per ton for the coal the first two years, two and a half times the amount for the next three years, twice the amount for the following four years, and one-half more for the balance of the time. And lest these rates might prove too little, the contract further provided that the sum paid should not be less than ten per cent added to the cost of the coal to the contractors. These terms and the leasing of all the coal lands of the

company for fifteen years to those parties upon a royalty of twenty-five cents a ton for the first nine years, and without any royalty afterwards if the price of the coal should be reduced to three dollars, with the stipulation to provide side-tracks to the mines, and also to furnish cars for transportation of coal for general consumption, and after charging them only what was charged to others, to allow them a drawback of twenty-five per cent on the sums paid, gave to them a contract of the value of millions of dollars. These provisions would of themselves justly excite a suspicion that the directors of the railroad company, who authorized the contract on its behalf, had been greatly deceived and imposed upon, or that they were ignorant of the cost at which the coal could be taken from the mines and delivered to the company. But the evidence shows that those directors were neither deceived nor imposed upon, nor were they without information as to the probable cost of taking out and delivering the coal. And what is of more importance, it shows, as alleged, their previous agreement with the contractors for a joint interest in the contract, and, in order that they might not appear as co-contractors, that a corporation should be formed in which they should become stockholders, and to which the contract should be assigned; and that this agreement was carried out by the subsequent formation of the Wyoming Mining and Coal Company and their taking stock in it. This matter was so well understood that when the contractors commenced their work in developing the mines and taking out the coal, they kept their accounts in the name of the proposed company, though no such company was organized until months afterwards.

It hardly requires argument to show that the scheme thus designed to enable the directors, who authorized the contract, to divide with the contractors large sums which should have been saved to the company, was utterly indefensible and illegal. Those directors, constituting the executive committee of the board, were clothed with power to manage the affairs of the company for the benefit of its stockholders and creditors. Their character as agents forbade the exercise of their powers for their own personal ends against the interest of the company. They were thereby precluded from deriving any advantage from contracts, made by their authority as directors, except

through the company for which they acted. Their position was one of great trust, and to engage in any matter for their personal advantage inconsistent with it was to violate their duty and to commit a fraud upon the company.

It is among the rudiments of the law that the same person cannot act for himself and at the same time, with respect to the same matter, as the agent of another whose interests are conflicting. Thus a person cannot be a purchaser of property and at the same time the agent of the vendor. The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and, "constituted as humanity is, in the majority of cases duty would be overborne in the struggle." *Marsh* v. *Whitmore*, 21 Wall. 178, 183. The law, therefore, will always condemn the transactions of a party on his own behalf when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted. Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule; they are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect. They cannot, as agents or trustees, enter into or authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits. Hence all arrangements by directors of a railroad company, to secure an undue advantage to themselves at its expense, by the formation of a new company as an auxiliary to the original one, with an understanding that they, or some of them, shall take stock in it, and then that valuable contracts shall be given to it, in the profits of which they, as stockholders in the new company, are to share, are so many unlawful devices to enrich themselves to the detriment of the stockholders and creditors of the original company, and will be condemned whenever properly brought before the courts for consideration. *Great Luxembourg Railway Co.* v. *Magnay*, 25 Beav. 586; *Benson* v. *Heathorn*, 1 Y. & Col. C. C. 326; *Flint & Pere Marquette Railway Co.* v. *Dewey*, 14 Mich. 477; *European & North American Railway Co.* v. *Poor*, 59 Me. 277; *Drury* v. *Cross*, 7 Wall. 299.

The scheme disclosed here has no feature which relieves it of its fraudulent character, and the contract of July 16, 1868, which was an essential part of it, must go down with it. It was a fraudulent proceeding on the part of the directors and contractors who devised and carried it into execution, not only against the company, but also against the government, which had largely contributed to its aid by the loan of bonds and by the grant of lands. By the very terms of the charter of the company five per cent of its net earnings were to be paid to the government. Those earnings were necessarily reduced by every transaction which took from the company its legitimate profits. It is true that some of the directors, who approved of or did not dissent from the contract, early stated that they held their stock in the coal company for the benefit of the railroad company and transferred it, or were ready to transfer it, to the latter; but the majority expressed such a purpose only when the character and terms of the contract became known and they were desirous to screen themselves from censure for their conduct.

The complainant, therefore, can derive no benefit from the contract thus tainted, or sustain any claim against the railroad company for its repudiation. The coal company may, perhaps, be entitled to reasonable compensation for the labor actually expended in the development of the mines and delivery of coal to the railroad company, considered entirely apart from the contract; and also for its property forcibly taken possession of by the officers of the railroad company. But an accounting for compensation thus limited is not desired by him, and as the two companies have since settled the matter in dispute between them by the payment of $1,000,000 to the coal company, of which $100,000 has been set apart for complainant, and he has elected to take that sum if an accounting cannot be had upon the assumed validity of the contract, the decree of the court below is

*Affirmed.*