THE METROPOLITAN TELEPHONE AND TELEGRAPH COMPANY and THE NEW YORK AND NEW JERSEY TELEPHONE COMPANY, appellants,

*v.*

THE DOMESTIC TELEGRAPH AND TELEPHONE COMPANY OF NEWARK, NEW JERSEY, respondent.

A contract between the Bell Telephone Company of New York and the Domestic Telegraph and Telephone Company of Newark, New Jersey, stipulated that, at its termination, the Domestic company should have the first right to a new contract respecting the same matter, upon terms to be fixed by the Bell company. Three trustees (directors) of the Bell company, members of its executive committee, which committee had, by resolution of the board of trustees, been given entire charge of the conduct of its business, made a proposition to a committee of the Domestic company for such a new contract upon terms either specified or capable of being made certain, and upon condition that the Domestic company should buy the plant of a competing company which it was the interest of the Bell company to have purchased. Shortly after the proposition was made, the Bell company entered into an agreement providing for the creation of the Metropolitan Telephone and Telegraph Company, which was to succeed the Bell company, and it thereby became the interest of that company to have said plant purchased. The executive committee of the Bell company consisted of four persons. The meeting of the committee at which the proposition was made was a special one, and no notice thereof was given to the absent member, and one of the members present was a director and stockholder in the Domestic company.—*Held*, (1) That whether or not the

executive committee of the Bell company had acquired authority to bind that company by such a proposition, the committee was not then so constituted as to be capable of exercising any authority, because (1) no notice of the meeting had been given to the absent member, and because (2) one of the members present was incapacitated from acting by reason of his interest in the Domestic company, and so no quorum was present. Afterward the Domestic company accepted the proposition, and performed the condition by purchasing the plant in question for the price of $11,500. The purchase was made from the Metropolitan company, and the check of the Domestic company for the price was given to the Metropolitan company. The amount (except some rebate) has been retained.—*Held*, (2) Although the executive committee of the Bell company was not so constituted as to bind the company by making such a proposition, if authority to that effect had been conferred on the committee, yet the facts show a ratification and validation of the proposition and a resulting contract which should be ordered to be performed, and the Metropolitan company is estopped from denying the existence of the contract or its liability thereon.

*Mr. J. M. C. Morrow, Mr. J. D. Bedle, Mr. C. Parker*, and *Mr. B. Williamson*, for appellants.

*Mr. Henry Young* and *Mr. T. N. McCarter*, for respondent.

The opinion of the court was delivered by

MAGIE, J.

This appeal presents for review a decree of the court of chancery advised by Vice-Chancellor Bird, whose opinion is reported in *14 Stew. Eq. 241*.

The decree directed one of the appellants, the Metropolitan Telephone and Telegraph Company (which will hereinafter be called the Metropolitan company), to specifically perform an agreement found to have been entered into between the respondent, the Domestic Telegraph and Telephone Company of Newark, New Jersey (which will hereinafter be called the Domestic company), and the Bell Telephone Company of New York (which will hereinafter be called the Bell company), the liability of which last-named company it was also found the Metropolitan company had become subject to.

The first argument of this appeal was at March Term, 1887, and was mainly directed to the question whether the evidence jus-

tified the conclusion that the contract ordered to be specifically performed, had actually been entered into, and whether, if so, it was obligatory upon the Metropolitan company.

At November Term, 1887, a re-argument of two questions presented by the case was directed. *Metropolitan Tel. Co.* v. *Domestic Tel. Co., 16 Stew. Eq. 626.*

The re-argument was heard at March Term, 1888, and the whole case is now presented for decision.

The dispute of fact, respecting the existence of the contract in question, centres in the occurrences of an interview which took place at the Gilsey House, in New York, between three of the trustees of the Bell company, who were also members of its executive committee, and three directors of the Domestic company, specially appointed by its board of directors to confer with a committee of the Bell company.

At that time a contract existed between the Bell company and the Domestic company. The Bell company controlled the Bell telephone patents for the territory in which Newark was included. The contract licensed the Domestic company to use the Bell telephones in Newark &c., on certain terms, up to September 1st, 1884. By its eleventh section it stipulated that the Domestic company should have the " first right " to a new contract respecting the same matter, on terms to be fixed by the Bell company.

The contention of the Domestic company is, that the Bell company sought the Gilsey House interview with intent to induce the Domestic company to buy the plant of the Western Union Telegraph Company, embarked in a rival business in Newark, and which it was the interest of the Bell company should be bought by the Domestic company ; that the trustees of the Bell company there proposed to give the Domestic company a new contract for the same matter, upon certain terms, and to run from the expiration of the existing contract, upon condition that the Domestic company should buy said plant ; and that the proposal was duly reported to the board of directors of the Domestic company, which afterward accepted it and performed the condition by purchasing the plant in question.

The evidence respecting what occurred at the Gilsey House interview is decidedly contradictory. The Vice-Chancellor analyzed it with great care, and compared the narration given by each of those present. I deem it unnecessary to repeat the labor. It is sufficient to say that after repeated examinations and comparisons of the testimony, I have become convinced, not only that it presents no case for reversal, but also that its decided preponderance is in favor of the conclusions reached below. For the reasons given below, I think there was such a proposition, and for such a new contract as the Vice-Chancellor found.

For the reasons given by the Vice-Chancellor, and other reasons hereinafter given, I have also concluded that the Domestic company accepted the proposition and performed the condition upon which it would become entitled to the new contract, and also, that the Metropolitan company were liable upon such contract in the place of the Bell company, to the rights of which it had succeeded.

The first of the two questions directed to be re-argued relates to the capacity of those present at the Gilsey House interview to act for and represent the Bell company.

It involves primarily the question whether that company had delegated to them authority to make the proposition, so that upon acceptance that company would be bound.

It appears that the managers of the Bell company are called trustees. Before that interview, the board of trustees had elected an executive committee of four of its members, and had passed a resolution that the executive committee should have entire charge of the conduct of the business of the company and the directing of the general superintendent. The three trustees of the Bell company were members of the executive committee.

It may be inferred that the business of the Bell company was the licensing of local companies to make use of the telephones which it controlled, and the renting of such telephones to those companies under contracts.

Directors of an incorporated company, although in a sense agents of the company, may doubtless, in some cases, appoint sub-agents, whose acts will bind the company. The general rule

is, that directors may not delegate authority in matters committed to their discretion and judgment. But since incorporated companies for manufacturing and business purposes have become so common, the rigor of this rule has been measurably relaxed. It would intolerably restrict the operations of a great railroad or manufacturing corporation if every contract of employment of its workmen or of sale of manufactured articles must be made directly by the directors. The universal practice is to commit such matters of current and ordinary business to committees, superintendents and clerks. With respect to such business it may be said that authority to bind the company may be delegated, because it has not been confided to the personal judgment and discretion of the directors. *Green's Brice's Ultra Vires* 490; *Burlington* v. *Dennison, 13 Vr. 165; Hoyt* v. *Thompson, 19 N. Y. 207; Millville Fire Ins. Co.* v. *Mechanics Building Assn., 14 Vr. 652.*

If this point called for decision, I should incline to the view that the trustees, if possessed of the ordinary powers of directors, might authorize a committee to make such a contract, being for its current and ordinary business, and that the resolution, although expressed in very broad terms, should be construed to give such authority as the trustees could give.

But the point does not call for decision, because the powers devolved upon the trustees of the Bell company are not shown, and because the view taken of the next point raised by this question, renders it unnecessary.

That point is thus presented : If it be assumed that the executive committee of the Bell company had been duly empowered to make such a contract, it is contended that the committee was not so constituted at the Gilsey House interview as to be capable of acting. The meeting of the committee at that time was a casual or special meeting. But three of the four members of the committee were present, and I think that it may be inferred from the evidence that no notice of the meeting had been given to the absent member. Of the three members present, one, Mr. Harrison, was a stockholder and director in the Domestic company.

Under those circumstances, I am forced to conclude that the

executive committee was not then so constituted as to be capable of exercising any authority which had been delegated to it.

When power is given to be exercised by several, in the absence of a rule requiring the concurrence of a definite number, a majority of a quorum duly convened may act. *Wells* v. *Rahway W. R. Co.*, *4 C. E. Gr. 402;* *Cadmus* v. *Farr, 18 Vr. 208;* *Barnert* v. *Paterson, 19 Vr. 395.* But since each is entitled to take part in the exercise of the power, each is entitled to notice. Notice may be given by the adoption of rules fixing times for stated meetings; constructive notice will be sufficient if some rule, legally prescribed, declares it sufficient; but for special meetings, in the absence of a rule for constructive notice, actual notice must be given. In the absence of such notice, a special meeting will not be legally convened. These rules apply to the corporators of incorporated companies, the directors and any committee thereof. *Green's Brice's Ultra Vires 438, and notes; Angell & Ames Corp.* § *492; Reeves* v. *Ferguson, 2 Vr. 107.*

If it may be presumed, as is contended, that notice was given to the absent member, I still think the committee lacked a quorum of members capable of acting.

Mr. Harrison occupied a similar fiduciary relation to each of the two companies. In performing his duty as a member of the committee of the Bell company he was required to use his judgment in fixing the terms of the contract with the Domestic company, in which he was interested. To sustain his capacity to do this would be like permitting one to be judge in his own case. Had the contract been executed or entered into without objection, it would no doubt have not been void, but, at the most, only voidable. *Stewart* v. *Lehigh V. R. R. Co., 9 Vr. 505; Guild* v. *Parker, 14 Vr. 430; Gardner* v. *Butler, 3 Stew. Eq. 702; Wardell* v. *R. R. Co., 103 U. S. 651.* Perhaps a contract between two incorporated companies may be sustained, where a minority of the directors of one are directors and interested in the other company, as has been done elsewhere. *United States R. Stock Co.* v. *Atlantic & G. W. R. R. Co., 34 Ohio St. 450.* But the point now under discussion relates solely to the power of Harrison to take part in settling the terms of a contract in which he

was adversely interested. In my judgment he was incapacitated so to do, and so no quorum of the committee was present capable of acting.

If, therefore, the contract in question depended solely upon an authorized act of the executive committee of the Bell company at the Gilsey House interview, I should be unable to support it.

But the second question directed to be re-argued suggests the ground on which I have concluded that the defect in the constitution or authority of that committee to make this contract will not be fatal to respondent's right to enforce its provisions.

The second question relates to the acceptance by the Domestic company of the contract proposed at the Gilsey House interview.

As already stated, I think the proposal there made was accepted. This appears from the resolution of the directors of that company, and their act in buying the Western Union plant in Newark, which was the condition on which the contract proposed was to depend. But I also conclude that the act of the Domestic company in performing that condition, was so accepted as to ratify and validate the unauthorized act of the members of the executive committee in proposing the contract upon that condition, and also to estop the Metropolitan company from denying the existence of the contract and its binding force on that company.

The contract is, beyond any doubt, one which the two companies could lawfully make. Any incorporated company may ratify the acts of agents, though done without previous authority, if the acts are within the powers of the company. *Angell & Ames Corp.* § *304; Hoyt* v. *Thompson, 19 N. Y. 207; Olcott* v. *Tioga R. R. Co., 27 N. Y. 546.*

A brief statement will indicate the facts from which I think ratification is to be inferred.

The Bell patents, which the Domestic company, by its original contract, was licensed to use, were controlled by the National Bell Company. The Bell company had obtained from that company the control of the patents for the territory in which Newark was included. The Western Union Telegraph Company controlled the patents of Edison, and under that company a telephone exchange had been established in Newark, competing with the

Domestic company.  It appears that similar competition occurred in other localities, and litigation respecting the patents was going on when, on November 10th, 1879, the Western Union and the National Bell companies entered into an agreement.  The territory in which Newark is situated was excluded from its operation.  But the agreement was plainly designed to harmonize the conflicting interests and put an end to competition where it did operate, by permitting the Bell company to control the telephone business, with a restriction against using it in competition with the special business of the Western Union and the Gold and Stock Telegraph Company, licensed by it, within the excluded territory.  And it was plainly intended eventually to bring the excluded territory within the same terms of arrangement.

Therefore, on April 30th, 1880, the Gold and Stock Telegraph Company, the Bell Telephone Company of New York, and the National Bell Company, entered into an agreement respecting the conflicting interests within the territory excluded from the operation of the former agreement.  It provided for the creation of a new company, by the name of the Metropolitan Telephone and Telegraph Company, which was to acquire the rights of the contracting parties, and eventually occupy that territory with their telephone interests, being restricted, however, from competing with the Gold and Stock company respecting a class of business such as was mentioned in the agreement of November 10th, 1879.  Since the Domestic company then had a contract for Newark which had some time to run, the agreement provided for that case, by giving authority to the new company to acquire the rights of the Bell company in the contract with the Domestic company, and by stipulating that if the Domestic company would confirm the right of the new company and submit its territory and instruments to the terms of the agreement of November 10th, 1879, and the National Bell company, or its nominee, should take and pay for the plant and property of the Western Union company, in Newark, then the territory covered by the contract of the Domestic company should be subject to the last-named agreement.

It obviously became the interest of the contracting parties and

of the new company to be created, that the plant of the competing· company in Newark should be thus purchased, and that such purchase should be made without expenditure of money on their part.

The Gilsey House interview occurred a few days before the date of this agreement, but it may be inferred from the evidence that such an agreement was in contemplation. As has been stated, the interview seems to have been sought by the Bell company, with a view to persuade the Domestic company to purchase the plant in question, and the weight of evidence is that a new contract was proposed to the Domestic company if it would make such purchase. The committee of the Domestic company was not empowered to accept the proposition, but reported it to their board, which, in June, 1880, determined to make the purchase.

At that time the Metropolitan company had been incorporated, and had, to some extent, taken the place intended by the agreement providing for its creation.

On May 20th, 1880, the chairman of the executive committee· of the Metropolitan company wrote to the Domestic company, informing it that the Metropolitan company was prepared to turn over the Western Union property at Newark, on payment of $11,500.

On June 14th, 1880, the same officer wrote to the Domestic company, enclosing orders of the Western Union company upon its agent for the transfer of the plant in Newark. He cautioned the Domestic company to examine the property to satisfy themselves that it was the same they had agreed to purchase of the Metropolitan company, and such as they would accept in discharge of the understanding between the companies for the sale· of the property to the Domestic company. He directed that in payment the check of the Metropolitan company should be delivered by the Domestic company to the agent of the Western Union, and the same amount was then to be paid by the Domestic company to the Metropolitan company.

On June 17th, 1880, a check of the Domestic company for· $11,500, drawn to the order of the treasurer of the Metropolitan.

company, was delivered.   About that time an agent of the Metropolitan company and an agent of the Western Union company attended at Newark and transferred the plant, which was received by the Domestic company.   The check was paid and the money so procured, except a small rebate, has been retained.

This written evidence, made at the time, convinces me that the purchase in question was designedly made from the Metropolitan company, and in pursuance of some " understanding " between that company and the Domestic company.   I have searched the testimony in vain for any trace of negotiations or understanding between the two companies, except such as may be considered to have occurred at or arisen out of the Gilsey House interview. Assuming those negotiations to have been referred to, the references of these letters are natural and consistent, and show that on May 20th, 1880, the Metropolitan company had acquired information that a proposition that the Domestic company should buy the plant in question had been made, and on June 14th, 1880, it had acquired knowledge that the Domestic company had accepted the proposition by agreeing to purchase, and so an " understanding " had arisen between the two companies.   Any possible doubt evoked by the evidence of the writer of those letters, respecting his knowledge of the terms of the proposition, has been dispelled, for I have failed to discover therein any rational or satisfactory statement of what the " understanding " between the two companies, which he admitted to exist, actually was.   Moreover, he and other leading officers of the Metropolitan company, shortly after, engaged in preparing drafts for a new contract with the Domestic company.   These efforts to prepare a new contract were not casual, but continued for some time, and, except upon the theory that the Domestic company had acquired a right to a new contract, I cannot discover any satisfactory explanation of those efforts.

From these circumstances, and others of the same purport, I am satisfied that the Domestic company purchased the plant in question from the Metropolitan company, and upon an understanding with it, which arose out of the proposition made at the Gilsey House interview and its acceptance.

37

The Metropolitan company, by acceptance of the Domestic company's performance of the condition contained in the proposition, under circumstances indicating knowledge thereof, recognized and ratified the unauthorized act of the trustees of the Bell company in making the proposition, and, by accepting and retaining the purchase-money, has estopped itself from denying either the existence of the contract or its liability thereon.

For these reasons, I think, a contract came into existence between the parties which ought, in equity, to be performed, according to its terms, and since the terms seem established by the weight of evidence to be such as the decree states, I shall vote to affirm the decree which requires its performance.

*For affirmance*—DEPUE, KNAPP, MAGIE, SCUDDER, VAN SYCKEL, BROWN, WHITAKER—7.

*For reversal*—THE CHIEF JUSTICE, DIXON, REED, MCGREGOR, PATERSON—5.