WATSON TRYON *vs.* THE WHITE & CORBIN COMPANY.

Hartford Dist., Jan. T., 1892. CARPENTER, SEYMOUR, TORRANCE, J. M. HALL and ROBINSON, Js.

The plaintiff was a subcontractor under *A* to do the mason work and furnish materials for the alteration of certain factory buildings of the defendant corporation and the erection of an additional building according to specifications agreed on. After his contract was made with *A*, the company made a location of the new building which required the laying of a deeper foundation and the use of more material than the plans and specifications showed. In a suit against the company for compensation for the extra work and materials, the plaintiff was allowed to testify that *C*, who was one of the three directors of the company, on his stating the case to him, replied that if extra work was necessary he ought to have pay for it; that they were intending to have a meeting of the directors at noon on that day and that he would bring the matter up and would send word by *A*, the principal contractor, of the result; that he did not want the work stopped, and that the plaintiff should go on with it and the company would pay him. Also that afterwards, at the meeting of the directors, *A* went to their office and returned to the plaintiff with the statement that the company would pay him for the extra work and that he was to go ahead. Held to be admissible.

The work was found by the jury to be in fact extra work. The plaintiff went on with it with the knowledge of two of the three directors that he so regarded it and expected compensation for it, and when the work was done the company took the benefit of it. Held to create an obligation on the part of the company to pay what the work was worth, even if *C* was not authorized to bind the company by his direction to the plaintiff to go on with the work and his promise that the company would pay for it.

[Two judges dissenting.]

[Argued January 7th—decided June 30th, 1892.]

ACTION to recover for extra work done and extra materials furnished in the erection of a building for the defendant company ; brought to the Superior Court in Tolland County, and tried to the jury before *Fenn, J.* Verdict for the plaintiff and appeal by the defendant. The plaintiff had taken a contract to do the mason work in the erection of the building in question, under one Arnold, who was the principal contractor. The contract of Arnold with the defendant

contained the following among other specifications with regard to the building in question, which was called the picker-house :—

"Specifications for work to be done in the erection of a one-story building to be used for a picker-room and flock room; building to be brick above foundation; the building to be erected for the White Corbin Mfg. Company in the rear of their present mill at the other side of the brook and near the brook. * * *

"Excavate for all walls and piers as shown on plans, section and elevation, all excavations to go down to hard-pan, as may be directed by the architect. * * *

"In the foregoing specifications it is intended to enumerate all the leading particulars in the erection of said building, and it is to be understood by the contractor that said building is to be finished complete to the intent of said plans and the specifications made for the same by C. R. Makepeace & Co., architects and mill engineers, and to the satisfaction of the superintendent of the company.

"The drawings and details are a part of this specification, and are for this building only. All measurements on the different plans and drawings are to be carefully examined before the work is done, and after the work is done, in order that mistakes may not be made in bringing together the different kinds of work. The mechanics are to make no alterations from the plans and specifications. All the wall to be built as shown on the plans, elevations, and sections."

The contract of Arnold with the defendant company included alterations of and an addition to another building of the defendant, and the contract of the plaintiff with Arnold included the mason work of that part of his contract. The plaintiff's claim originally included some extra work and materials furnished for these constructions; but as no question arises as to this part of the plaintiff's case no further notice is taken of it.

The other facts of the case are sufficiently stated in the opinion.

*A. P. Hyde* and *C. Phelps*, for the appellants.

1. The court erred in admitting the evidence of the plaintiff against objection that in the construction of the north wall of the picker-house it was required to excavate eight feet deeper than was shown by the plans, it being admitted that the specifications were in writing and required the walls to be carried down to hard-pan. The location of the picker-house had been determined by Tryon and the defendants, without objection, as a compliance with the plans and specifications. The depth of the foundations shown in the plans was only a loose estimate, which was liable to be varied to a greater or less extent upon making the excavations. The questions here raised were fully determined in the cases of *Stuart* v. *Cambridge*, 125 Mass., 102, and *Sullivan* v. *Sing Sing*, 122 N. York, 390.

2. The court erred in admitting the testimony of the plaintiff, as to a conversation he had with Mr. Corbin, one of the directors of the defendant corporation, as to whether the plans called for a certain depth or not. This is a vital point in the plaintiff's case, as there is no other evidence from which an express or implied contract with the defendants with relation to this picker-house can be claimed by him. The objection was that Mr. Corbin had no authority to make any agreement in relation to the building of the picker-house, but that the whole authority was delegated to Mr. Prescott. This was shown by a copy of the record of the corporation. That Prescott was its authorized agent was well known to the plaintiff. He testified that after he found that the excavation required a greater depth than was shown by the plans, he went to see Mr. Prescott, whom he informed that it was going to make a good deal more stone work, moving it in the way they did, and would require much more stock to build the work, and he should want more pay, but that Prescott refused to pay for any extras; that he then informed Prescott that he should be obliged to stop work, and that he could not give him that amount of extra work, and that thereupon Prescott told him he could stop work, and that he would not pay him for any extras. Now this testi-

mony substantially agrees with the testimony of Prescott. It is admitted that from the time that Prescott informed Mr. Tryon that he would not pay any extras for building this wall, or the extra excavation of the wall, Tryon proceeded with the work. He never had any further conversation with Prescott about the picker-house until he finally presented the bill after the entire work had been completed, and more than a year after the completion of the picker-house. And it was not until after the defendants had paid Arnold the whole bill for the stone work. Notwithstanding this refusal and notice of Prescott, Tryon attempts to make out a contract to go forward with the work, and sets up his claim for extras under a conversation had with Mr. Corbin, one of the directors. There was no evidence that Corbin had any authority to make any contract. On the contrary, it appeared that the whole authority was conferred upon Prescott. The court says that upon its being admitted that Corbin was a director, and in view of other evidence as to his actions in reference to the work, it admitted his testimony. It is well settled that an agency cannot be proved by declarations of the claimed agent, but it must be proved *aliunde*. *Way* v. *Peck*, 47 Conn., 23. But Tryon's own statement of the conversation he had with Corbin does not show that Corbin claimed any authority to make any contract on behalf of the company. His testimony is that after he had told Corbin what Prescott had said, Corbin said that " if the facts were as he said, if there was extra work he ought to have pay for it, and that they were going to have a meeting of the directors at noon that day, and that he would then bring the thing up, and would send word by Arnold of the result. That he did not want to have the work stopped, and told him to go ahead and the company would pay him." Now, taking this statement altogether, it is evident that Corbin did not claim any right to make any contract himself, but promised to bring the matter before the board of directors, and that the last remark, that he did not want the work stopped, and that if Tryon went on with the work the company would pay him, was an expression of

an opinion, and not an assumption of authority. It must also be remembered that, instead of there being any corroborative testimony that Corbin had any authority to act, he himself testifies that he had no authority to act, and never gave any such instructions; that he never had anything to do with the business of the company, except occasionally to advise with the general manager.

3. The court erred in admitting the testimony of Tryon as a witness to prove the conversation with Mr. Arnold, in which he claimed that Arnold, after going to the office of the defendants, returned from there and stated that the company would pay him for the extra work, and to go ahead. There was no evidence offered that any question came up before the board of directors at the office of the company, or that any authority was given to Arnold to make any such statement. Mr. Arnold himself testifies that he never gave any such instructions, and never was authorized so to do; but on the contrary, that he informed the plaintiff that Prescott refused to pay for any extras on the picker-house, and claimed that he had no contract with the plaintiff in relation thereto, and upon the statement of the plaintiff that he would not go on with the work unless he was paid extra, he, Arnold, refused to pay for any extras, and upon his threat to remove his men he told him he might do so, but that he should put on other men and complete the work. Now Tryon's testimony is to prove that Arnold, an agent of Mr. Corbin, who was himself not an agent of the company, directed him to go ahead for the company, and it would pay him; and this against the testimony that Prescott had forbidden his going ahead on any liability of the company, and against the testimony of Arnold that he was never authorized to make any such statement or ever did, but on the contrary that he proposed to complete the work if Tryon refused. We submit that there is no rule which would justify the admission of such evidence for the purpose of proving an express or implied contract.

4. The fifth and sixth reasons of appeal may be considered together. In the first part of its charge the court stated

that if the plaintiff went on to build the picker-house against the protest of the agent of the company he could not recover for extras, yet this instruction is modified in a way destructive of its whole effect by the use of the following language:—" Unless you find that afterwards he was by proper agents of the company, or those having authority to act for it, recognized as the contractor with the defendants, and the defendants did undertake and agree to it, or in conformity with the principles of law elsewhere stated in this charge, did become obligated to pay the plaintiff therefor." What was meant by the latter part of this charge? The court had charged the jury substantially that if Tryon went forward and built the picker-house or furnished any other extras, there would be an implied contract on the part of the defendants to pay for such work what it was reasonably worth. And again, later in the charge, the court says:—" If, however, the defendants, not expecting to compensate or render themselves liable to compensate the plaintiff, by their words or conduct caused the plaintiff to believe they would pay him for doing the work which he was under no obligation to do, and in consequence of such belief induced him to perform such work, such conduct would constitute what is known as an *estoppel in pais*, in conformity with the rule that where one person by his word or conduct, causes another to believe in a certain state of things, and thus induces him to act under that belief so as to affect him injuriously, he is concluded from averring to the contrary." Again, still later, the court says:—" There is a general rule of the law, that where one renders services and furnishes materials for another at the latter's request, whether that request is expressed or implied, and there is no previous agreement between the parties which affects the right to charge for the services or materials, or as to the amount of compensation to be paid therefor, the party so rendering the services and furnishing the materials is entitled to recover therefor such sum as they are reasonably worth." Now, taking these several charges together, we say that they were entirely inapplicable to the facts which were before

the court and jury in this case. The plaintiff was a sub-contractor for Arnold. The defendants contracted with Arnold to do this work, and paid Arnold in full for doing the work before they received any notice that any claim was to be made by the plaintiff for extras. They had no right to interfere with Mr. Tryon in completing his work under Arnold's contract. So long as he was simply completing the work, and having notified the plaintiff through their agent that no extras would be allowed, they had no reason to suppose that any claim would be made for any such extras.

5. The court erred in charging the jury that "a corporation will be bound by the unauthorized acts of any of its directors or officers if it subsequently ratifies those acts, or so conducts itself with reference to them that it ought to be estopped from denying his authority." There were no facts proved to which such a claim was applicable. What unauthorized acts of the contractors were ratified, and how could they be ratified? It is in evidence and admitted that Prescott, the agent, had no notice, after he had informed Tryon that he would pay for no extras, that Tryon was claiming to do any work for the company on which he was to claim any extras. The mere fact that the company accepted and used the picker-house after its completion, and after they had paid Arnold for building it, certainly was no ratification of any unauthorized claim made by Tryon in relation to the erection of that building. But the court seemed to instruct the jury that notwithstanding the defendants' refusal to pay any extras for the building, and although the building was erected under such refusal, yet if they accepted it they would be bound to pay for any extras which the plaintiff might claim.

*C. H. Briscoe* and *J. W. Johnson*, for the appellee.

ROBINSON, J. The defendant is a corporation with three stockholders, White, Corbin and Prescott, and these three stockholders make up the board of direction. The plaintiff

is a mason and builder, and was engaged as a sub-contractor
to do certain work and furnish certain materials in his line
in the alteration of the factory buildings of the defendant,
and in the erection of a picker-house for the defendant, the
entire job having been let to one Arnold as the principal
contractor. The plaintiff in doing the work and furnishing
the materials essential to his part of the work, claimed that
he furnished extra labor and extra materials for which he
was entitled to extra compensation, and this suit was brought
by him against the defendant to recover such extra compen-
sation. It was tried to the jury, and a verdict was returned
for the plaintiff to recover $1,317 and costs.

The defendant has appealed to this court for claimed er-
rors in the admission of testimony and in the charge of the
court. The defendant sets up ten reasons of appeal, but
the second and third subdivisions of the first reason of ap-
peal are the most noticeable and to my mind the most seri-
ous errors assigned in the case. They are those which are
claimed to have arisen in the admission against the defend-
ant's objection of the declarations of Corbin and Arnold to
Tryon touching the matter of the claimed extra work. Mr.
Corbin was one of the directors of the defendant corpora-
tion, and it appears had taken some part in the matter of
arranging the location of the picker-house hereinafter re-
ferred to, and was claimed to be in fact the particular officer
who made the last change in its location. Mr. Tryon was
permitted by the court to testify that, after he found that
the excavation necessary for a firm foundation for the picker-
house in its changed location required a greater depth than
was shown by the plan, he went to see Mr. Prescott, one of
the other directors, who was also the treasurer and general
manager of the company, about this matter, and informed
him that in view of this change very much more stone work
would be required and a larger amount of stock would be
necessary to complete the work, and that he should expect
more pay; but that Mr. Prescott refused to pay for extras;
and that he, Tryon, thereupon informed Prescott that he
should be obliged to stop the work, and that he could not

give the company that amount of extra work, and that Prescott thereupon told him that he could stop work and that he, Prescott, would not pay him for any extras; that directly after this Tryon went to see Corbin, and told him how the matter stood and what Prescott had said; and Tryon was allowed, against objection, to testify that Corbin made reply to him, that if the facts were as stated by him, if there was extra work he ought to have pay for it; that they were intending to have a meeting of the directors of the company at noon that day, and he would then bring the matter up and would send word by Arnold, the principal contractor, to him, Tryon, of the result, and that Corbin further said that he did not want the work stopped, and then and there told him to go ahead and the company would pay. The plaintiff, Tryon, was also permitted against objection to testify that, after having this conversation with Corbin and at the hour named, Arnold went to the office of the defendant, and returned from that place to Tryon, and stated to him that the company would pay him for the extra work and that he was to go ahead.

All this was denied by the defendant, but whether it is true or false is not the question in this case. The jury had the right and the power to find it to be true. The only question is, was the testimony admissible in any view of the case and did it legitimately and properly tend to establish any obligation on the part of this company to pay for this extra work and material.

Supposing it to be true that Corbin did have this talk with Tryon and did tell Tryon that the directors were to have a meeting that day at noon, and that he, as one of those directors in that meeting, would bring up the matter of this claimed extra work and extra pay, and that he would send word to him by Arnold of the result. And suppose Arnold did in fact go to the company's office at the hour named and did in fact come to Tryon from that office on that day and hour and say to him—"The company will pay you for the extra work; you are to go ahead." Supposing all this to be true, are there not other facts and circumstances

in this case which, taken in connection with the above, would create some kind of an obligation on the part of the defendant to pay the plaintiff for such extra work and extra material? Is there not a view that can justly and properly be taken of this case that makes this testimony entirely admissible?

Suppose the trial judge had rejected this testimony, and the plaintiff had come here claiming error in its rejection, how could this court have justified such rejection? Could we say that in no aspect, and for none of the purposes of this case, was this testimony admissible? Let us keep this also in mind as we review the situation.

Now after this talk with Corbin and after Arnold had delivered this communication, Tryon goes forward and completes the work, and the company refuses to pay on the ground that it owes no obligation to him. They say that no debt was created and that this testimony should not have been admitted because Corbin had no authority to bind the company to pay Tryon, and because what Arnold said was merely hearsay.

Should the company under all the circumstances be permitted to avail itself of this claim, and can it justly say that no obligation on its part to pay Tryon has arisen out of all the facts?

Suppose Corbin, instead of making the communication through Arnold, had himself made it directly to Tryon, would not Tryon have had every reason to believe that Corbin was telling him the truth as to the action of the company? Would he have had no right to rely upon such a statement coming from such a source, or should it be refused the place of a factor in this case because there was no evidence of any express authority to Corbin to bind the company? A majority of the directors at least had full knowledge that Tryon claimed to be doing extra work, and that if he did it he should expect extra compensation. He had told both Prescott and Corbin this, and they saw him from day to day doing this work; in fact all the directors from time to time saw him going forward with it; the work

was in fact extra work and the company to-day retains the benefit of it.

Now is there nothing in all this that ought to close the mouth of this company? Can a director, acting in the manner that Corbin did and professing to communicate to Tryon the action of the company, persuade Tryon to expend his work and materials upon the company's property and thus give the company the benefit of them, without all these circumstances becoming important and vital factors of the company's liability for the reasonable worth of such expenditures? Can the company say that one of our directors did indeed deceive Tryon, that he misrepresented the facts to him and induced him to do what he would not otherwise have done, and our company has obtained the resulting pecuniary benefits, and we have them in our pockets and intend to keep them there, because Corbin's statements were not true, and because our company did not in fact make any such order as Corbin reported to Tryon. We intend to keep our advantage; we intend to keep Tryon's money, materials and labor, notwithstanding every member of our board of direction saw Tryon going on all the time precisely as if he understood and supposed that the company was to make him good for these expenditures as extras, and notwithstanding the fact that he told the majority of the directors, Prescott and Corbin, that he would not go on unless he was to be paid for them as extras, and notwithstanding it does not appear that Tryon ever said to either of them or to any of the directors or agents of the company at any time, that he had changed his intention in that regard.

Is this a just and equitable position for this company to take? Was there not enough in all this at least to put these directors and this company upon an inquiry, if they did not in fact intend and never had intended or agreed to treat this work and these materials as extras. They all saw them being furnished; they were in fact extras; they were expenditures which the company knew Arnold was making no claim upon it for, but which the company knew Tryon had said he should regard as extras; and which he should not

furnish unless the company was willing to pay him for them as extras.    The company and its directors saw Tryon from day to day going on and doing this precise extra work and furnishing these extra materials.    It appears to be a fact that he was doing all these things as extras and doing them upon the strength of the word which Corbin had in fact communicated to him as to the company's desire and purpose concerning them.

But it is said that it was not Corbin but Arnold who communicated to Tryon the claimed result of the directors' meeting.    If Corbin chose Arnold as the medium of communication, is the communication of any the less legal value to Tryon as a fact in this case than if Corbin had personally communicated it?    Corbin in fact selected this medium; he told Tryon by whom he would send word of the result; and that word came in precisely the mode indicated and pre-arranged by Corbin.    Suppose he had sent the word by letter, would not the letter have been admissible?    Most certainly, if anything that Corbin could say on the subject would be admissible, and had Corbin brought the word himself Tryon's testimony as to what Corbin said would doubtless under the same limitations have been just as admissible as the letter, and, had the letter been lost, as its contents could have been; but instead of writing or coming himself he says I will send word of the result by Arnold; I will make Arnold the medium; I will use Arnold as my mouthpiece; you may treat what Arnold brings you as my utterance and as truly representing the result of the action in our directors' meeting.    Now, as I have said before, if Corbin's own words as a director to Tryon would have been admissible for the purposes of this case, certainly the words of his chosen mouthpiece were admissible and must be treated as the declarations and admissions of Corbin.

But outside of this we have the testimony of Tryon that Corbin himself told him to go forward and the company would pay him, and accompanied this order and declaration with the remark that he did not wish the work stopped; and the record shows that Tryon did go on and did com-

plete this work, putting in the extras in dispute. Tryon went to Corbin as a director and as a director Corbin took up the matter and gave the order which was given, and further added that he would bring the matter before the directors' meeting to be held that day at noon, and tells Tryon that from this meeting he will send him word of the result, and Tryon says that word did come to him of the result by the messenger that Corbin told him he would send it by.

Was or was not Corbin here acting officially? No matter if he had no special authority to act; acting thus in an apparently official character and manner, did he not induce Tryon to go on and expend his money, labor and materials for the benefit of the company, and have not these been added to the company's assets, and has not the company accepted them, and is it going too far to hold that such conduct on the part of a director, under such circumstances, producing such results and followed by such acceptance and retention by the company, has created an obligation to pay on the part of this corporation? Is the company entirely without liability here?

It must be true that an acceptance of the benefits of the transaction imposes an obligation to assume its burdens.

In the case of *Rolling Stock Co.* v. *Atlantic & Gt. Western R. R. Co.*, 34 Ohio St., 463, the court held that an acceptance there did impose just such an obligation, and laid down the rule that such acceptance operated to confirm the transaction as a whole.

And again, the part that Corbin and Arnold performed in this transaction was certainly admissible as a part of the transaction itself, explanatory of how Tryon permitted himself to go on after the discouraging talk with Prescott, and as indicating that he never contemplated this work and these materials except as extras to be furnished only for extra pay, and as indicating, notwithstanding Prescott's refusal to pay for them as extras, Tryon's constant understanding that he was in fact furnishing them as extras, and furnishing them as extras under the supposition that the company had

yielded to his claim in that respect. This testimony certainly tends to show that Tryon was acting in good faith in the matter and was not knowingly or intentionally thrusting his money, property and labor upon the company against its wishes and entirely at his own risk and charge as a meddling stranger and volunteer.

Assuming that all Corbin and Arnold said to Tryon as to the holding of a directors' meeting and as to the action of the company was false, the fact still remains that these things were uttered to Tryon, and that Tryon trusted these false and unwarranted representations, which professed to convey to him the *bonâ fide* action of the company, and he expended his labor and furnished his materials to the company on the strength of their truthfulness, and the company in fact received this labor and these materials and added them to its assets and to-day retains and enjoys the benefit of them. Would there not be something wrong in the principles and reasoning that would release the defendant from any obligation to pay under such circumstances? Should the company be allowed to keep the fruits of Corbin's deceit and at the same time say it has no obligation upon it and owes no duty to Tryon growing out of these circumstances? Can this director, acting ostensibly in an official capacity, deceive Tryon and thus procure him to put his work, materials and money into the company's property, and the company keep the value and benefit of such work, money and materials without paying for them, because its director had no special authority to say what he did say, or because he was guilty of unqualified deception when he sent word in effect that the company had agreed to pay him for the work as for extra work? Is this law, is it good law? Can a corporation hide behind such an excuse as that? Can it keep the fruits and repudiate the act that procured them? Can the company retain the advantage of Corbin's orders and repudiate his authority to give such orders for the company? We think not; and if not, then this jury was warranted in finding just such a verdict as they did find, and the evidence

objected to was clearly admissible for the purpose of establishing just such a situation and just such an obligation.

It must be admitted that this work and these materials were in fact extras, and taking this as a fact, and assuming that all that Tryon says is true, as the jury had a right to find and must have found, how can the company honestly ask to be excused from paying Tryon what these things were reasonably worth? And how can the company with any semblance of legal right object to Tryon's showing how and under just what circumstances he did this extra work and furnished these extra materials, and how he came to be induced to make these expenditures, and that he did in fact make them as extras?

The talk with Prescott, and the talk with Corbin, and the report that Arnold, the chosen medium of Corbin for communicating the claimed action of the company brought to Tryon, are only so many circumstances explanatory of how and in what way Tryon was induced to furnish this labor and these materials, and characterize Tryon's own understanding of how he was making these expenditures. If Corbin did in fact bring the matter before the directors and the directors decided to treat these expenditures as extras, and to pay Tryon for them as such, and communicated that decision to Tryon, no matter how or by whom, there could be no question about Tryon's right to recover.

The defendant says however that there was no legal proof of such a state of facts. But it is not simply a question whether there is here any legitimate proof that the company had in fact taken any such action or whether this evidence was admissible for the purpose of showing an express contract. It may be that the most that can be claimed for this testimony in that direction is that it was only a declaration by Corbin, through Arnold, that the company had taken such action; but assuming that it was not admissible for either of the above purposes, was it not a declaration by such an official and under such circumstances as to put some kind of obligation upon the company, as to an innocent party dealing with it upon the strength of it, and furnishing the com-

pany upon the strength of it labor and materials which the company actually received and accepted, the value of which it still retains and enjoys? Could not the jury have justly and properly found that there was here something that the defendant had received at the plaintiff's hands, which it had retained, and which it was not entitled to retain without compensating him for it? We think so, and if so, this testimony was admissible to point out that situation.

The jury has found, as we have before suggested, that this labor and these materials were all extras; in other words they were values and things to which the company was not entitled without paying extra. The jury has also found and fixed what was a reasonable price to pay for the same, and has found also that the company received these benefits at the hands of the plaintiff; and it appears to be a fact that the company has retained these for its own enjoyment without making any return to the plaintiff for them. And now, assuming that the jury found or should have found that there was no express contract on the part of this company to pay for them, is there not still left a just obligation, under the circumstances, on the part of the company, to pay this plaintiff for what it has actually received and accepted and now keeps of his property? The results of Tryon's labor and expenditures have gone into this company's treasury when it was not entitled to them under any circumstances, and can it accept and keep them and refuse to compensate the plaintiff for them, because it has never in express terms promised to pay? If there is not an implied promise to pay arising out of the circumstances, there is at least a duty which the law imposes for reasons of justice to make fair compensation for what has been properly and actually received by the company and applied and made use of by it for its own increase and advantage.

The principle here invoked, and which, as it seems to me, should govern in this case, is substantially the same as is involved when directors for their own benefit have entered into a contract with their company. Such contracts are voidable at the option of any stockholder of the company

exercised within a reasonable time after obtaining knowledge of the existence of the objectionable agreement. Such a contract will not be sustained if sued upon. It may be avoided and set aside and declared to be no contract, but there is, notwithstanding, for reasons of justice, an obligation imposed by law upon the corporation to make fair compensation for what, by means of such contract, has been properly and actually received and applied by the company to its own use and benefit. Neither the company nor any of its stockholders can be permitted to repudiate the contract and also keep the benefits.

In the case of *Gardner* v. *Butler*, 30 N. Jer. Eq., 721, the court says :—" The agreements therefore which the directors made with themselves must be pronounced to be illegal and can furnish no support to their defense as contracts, but while the express undertaking is without legal force the directors of a company have a right to serve it in the capacity of officers, agents or employees, and for such services the law will enable them to recover a just and reasonable compensation. * * * No claim which they can make against their company can acquire any support or validity from the fact that they have expressly sanctioned it; it must rest exclusively upon its fairness and justice and be enforced upon a *quantum meruit.*" And on page 724 the court adds :—" He " (the director) " could not bargain for the sum he should receive, but he had a right to terminate the employment on the then existing terms and leave his compensation to be determined by a proper tribunal. The contract will not be regarded, but the services having been rendered, and the company having received the benefit of them, it would be manifestly inequitable to deny to the trustee a fair equivalent for them ; it would pervert a rule of law which is intended to guard against fraud and injustice. The right of a trustee to recover on the *quantum meruit*, when the contract is illegal, is recognized in our courts." And several cases are cited to this point.

And in the same case the case of *Aberdeen Railway Co.* v. *Blakie*, 1 McQueen's House of Lords Cases, 461, is re-

ferred to, and that is a case in which Blakie, as the chairman of the railway board, made a contract for railway chairs with the firm of which he was a member. The railway company, after accepting some of the chairs, refused to accept the balance, and Blakie, by his firm, instituted a suit to compel the performance of the contract. The court in *Gardner* v. *Butler*, above referred to, remarks of this case, and the manner of disposing of it, as follows:—" It was properly held that the company had a right to repudiate the contract, and that it could not be enforced against their dissent. If the action had been brought to recover for the chairs which had been delivered and accepted, I apprehend it would not have been held, in any court, that the company could have retained the property and have refused to pay for it, not the contract price, but what it was reasonably worth."

And in 1 Morawetz on Private Corporations, § 526, the author says, upon the subject of the obligation of a company to pay for the value received under a pretended contract with its agents, as follows:—" If the directors or other agents of a corporation supply it with money or property, under a pretended contract with themselves, and the money and property is properly used in carrying on the company's business or in adding to its assets, they are entitled to recover the value of the money or property so supplied in an action against the company. The obligation of the company to pay under these circumstances does not *rest upon any actual contract* with the directors, but is a duty which the law imposes for reasons of justice to make fair compensation for what has been properly received and applied. The same rule applies when the directors perform services for the company which are outside of the duties of their office."

The case of *Wardell* v. *Railroad Co.*, 103 U. S. R., 659, is one in which a contract, tainted with a directorship interest, was undertaken to be enforced against the railroad company, by a stockholder of a coal company, in which a majority of the stock was taken by six of the directors of the railroad company, and Justice FIELD, giving the opinion

of the court, says—" The complainant therefore can derive no benefit from the contract thus tainted, or sustain any claim against the railroad company for its repudiation. The coal company may perhaps *be entitled to reasonable compensation for the labor actually expended in the development of the mines and delivery of the coal to the railroad company considered entirely apart from the contract.*"

Morawetz, in the second volume of his work heretofore referred to, says in § 723—" Property or funds received under a void agreement, or their proceeds if they can be traced, must undoubtedly be yielded up to the owner. So in certain cases the law imposes an obligation to make compensation for a benefit received, *although there was no express or implied agreement to pay for it ;* as, for example, where money or any tangible property is received and appropriated by a party, or where money is paid under legal compulsion for the use of another; *in these cases a debt is created by operation of law.*"

And again in § 714 the same author says :—" If anything of value is given by one party to another under an attempted agreement which was not consummated for want of the necessary mutual assent or by reason of the want of authority of an agent assuming to represent one of the parties, an action may be maintained without reference to the agreement to recover the thing transferred, or, if it was converted, whatever may be equitably due for the value received. The same rule would apply if the agreement had been consummated but was not legally binding by reason of some prohibition of the law, unless the transaction was so immoral that the courts must for reasons of public policy decline to grant the remedy."

And again in § 715, Morawetz says :—" If money or other property is given to a corporation *under a contract which is void because the agent assuming to represent the corporation in the transaction had no authority to bind it, the corporation is liable to account for the money or other property so received.* The corporation must also pay the value of anything which has been applied to its legitimate purposes."

And in the case of *Newcastle Northern R. R. Co.* v. *Simpson*, 23 Fed. Rep., 214, the court set aside at the instance of the railway company a construction contract as *ultra vires*, but held "that the established rule in equity is, that a corporation is accountable for the benefits which it has received under an *ultra vires* transaction. Hence, in holding that the defendant's compensation for the materials furnished and work done by him should be measured by what it would have cost the plaintiff company to employ a responsible contractor to provide the same material and perform the same work, the master adopted a just standard. While the defendant is not under any guise to receive damages for the loss of his bargain, yet he is not to be put off with a bare reimbursement of his actual outlay. He is entitled to be paid for what he has done, fair rates, such as any other railroad contractor might have recovered therefor in the absence of express agreement as to compensation."

And this court, in the case of the *Union Hardware Co.* v. *Plume & Atwood Mfg. Co.*, 58 Conn., 219, has laid down in substance the same principle, that "the defendant having received the property of the plaintiff in pursuance of the agreement, it will not be suffered to appropriate it, and under the plea of *ultra vires* to defeat a recovery therefor; it will so far be held to the terms of the contract."

Now if this be the rule as to and in favor of a director who has been guilty of constructive fraud, and the rule as against a company whose agent has acted without authority, why should it not be true and applicable in the case of a litigant in the situation of Tryon, who without fraud and in good faith, and upon the suggestion and request of a director acting ostensibly within the line of his duty and authority, goes forward and furnishes many hundred dollars worth of work and material to the company, and the company obtains this benefit, adds it to its assets and proposes to retain it, without making any compensation for it? Is there not a reason equally as strong in this case as in the cases and authorities cited, for holding that an obligation to pay on the part of the company is thus created, and that the

company should pay? It seems to me, looking at this record alone, that the facts which the jury had the right to find would create just such an obligation, and if so this testimony was admissible to establish that situation, and even though the jury did not apply it wisely, or rather applied it in evidence of and to establish an express agreement, being admissible to establish such a duty to pay as the law imposes for reasons of justice, the court committed no error in receiving it.

It could not matter to the defendant whether the jury based their verdict upon an express contract or upon a duty such as the law imposes; if the plaintiff was really entitled to the performance of such latter duty by the defendant, it seems plain that the defendant suffered no injustice, and that this verdict ought to stand.

We discover nothing in the other assignments of error which ought to prevail.

There is no error in the judgment appealed from.

In this opinion ANDREWS, C. J., and CARPENTER, J., concurred.

SEYMOUR, J., (dissenting.) I find myself unable to agree with the majority of the court, that the testimony of Tryon, as to his conversation with Corbin, and subsequently with Arnold, respecting the agreement of the company to pay for extra work, is admissible.

Mr. Prescott was one of the directors of the defendant company, its treasurer, and its general manager of the work upon which the extra work was claimed to have been done, and was known so to be by the plaintiff. In view of a change in the location of the picker-house the plaintiff, who was doing the mason work for one Arnold, the contractor, informed Mr. Prescott that more work and material would be necessary to complete the work, and he should expect more pay. Mr. Prescott refused to pay for any extras, whereupon the plaintiff informed him that he should be obliged to stop work, and that he could not give the company that

amount of extra work. Mr. Prescott replied that he could stop work, and that he would not pay him for any extras.

Directly afterwards the plaintiff went to see Mr. Corbin, who was also one of the directors of the defendant corporation and had taken some part in arranging the location of the picker-house, and told him how the matter stood and what Prescott had said. The plaintiff was allowed to testify, against objection, that Corbin replied " that if the facts were as he stated, if there was extra work he ought to have pay for it; that they were intending to have a meeting of the directors of the company at noon that day, and that he would then bring the matter up and would send word to him of the result by Arnold, and that Corbin further said that he did not want the work stopped, and then and there told the plaintiff to go ahead and the company would pay.

The plaintiff was further permitted to testify, against the defendant's objection, that after having this conversation with Corbin Mr. Arnold went to the defendant's office at the hour named and stated to the plaintiff on his return that the company would pay him for the extra work and that he was to go ahead.

All this was denied by the defendant and by Mr. Arnold.

The question is—was the testimony admissible? I cannot see that it was. The purpose of it was to establish a promise on the part of the defendant to pay for the extra work. The agent of the defendant had distinctly declined to pay for it.

Corporations can contract only through agents, and there is no hardship here in applying the rule, because the plaintiff knew who was the defendant's agent and appealed to him in the first instance.

If the defendant company had held a meeting, as the plaintiff testified Corbin told him they were going to, and at such meeting had agreed to pay the plaintiff for extra work and that he was to go ahead, as the plaintiff testified that Arnold reported, then, upon proof of such action, the defendant would have been bound. But can the fact of the meeting of a corporation and the nature of

the business transacted at such meeting be proved in this way? Is it anything more than hearsay at the best? The plaintiff hears from Corbin that there is to be a meeting, and afterwards from Arnold, who is agreed upon, not between the plaintiff and defendant, as a messenger, but between Corbin and the plaintiff, that the company would pay him for extra work, etc. It seems to me dangerous to expose the defendant to liability in such a manner. If the defendant held a meeting and voted to have the plaintiff go ahead with the extra work and to pay him therefor, it could certainly be proved in the ordinary way.

It does not meet this point of the case to suggest that the defendant had the benefit of the extra work and ought to pay for it; and that the extra work was done under its observation and within its knowledge. If the defendant distinctly declined to pay for extra work, insisting, as it did in this case, that the work claimed as extra was work which it was the duty of the principal contractor to do under his contract, and the plaintiff thereafter continued his work without further concession on the part of the defendant, the latter had the right to assume that it was continued under the direction of the principal contractor without expectation of extra pay from the defendant.

There is nothing therefore in the case which to my mind relieves the pressure of the difficulty already very briefly suggested, that the evidence already referred to was not admissible to establish or assist in establishing the liability of the defendant for the extra work.

J. M. HALL, J., concurred in this opinion.